[Civ. No. 23770. Second Dist., Div. Two. July 17, 1959.]

JAMES INGRASSIA, Respondent, v. RAYMOND C. BAILEY, Appellant.

Maurice Rose for Appellant.

Sweeney, Irwin & Foye and William R. Sweeney for Respondent.

FOX, P. J.—Plaintiff, proprietor of a catering route in the industrial area of Los Angeles, leased the same, together with a truck with which to operate it, to defendant. Upon plain-

tiff's terminating defendant's lease the latter procured other equipment and immediately resumed serving the employees of the plants where he had previously stopped. Plaintiff sought to enjoin defendant's activities. A preliminary injunction was granted. Defendant has appealed.

Plaintiff is engaged in the industrial catering business, which is carried on by vending food and drinks from trucks to the employees of industrial plants as they go in to work, at coffee breaks and at lunch time. Stops are scheduled at various plants to coincide with these periods.

Plaintiff acquired the initial stops on the route in question by purchase from George W. McAttee, Jr., for $1,475. Plaintiff added other stops by hiring a route supervisor who solicited, secured and serviced such new locations.

On July 15, 1957, plaintiff leased the lunch route and truck for its operation to defendant. In accordance with the terms of the agreement defendant received from plaintiff a route list showing the names and addresses of certain industrial concerns that he was to service, the place at which he was to park in order to serve the employees of the particular plant, the time he was due to arrive at each place, the time allocated for each stop, his departure time and the number of employees of each company. These stops were arranged in sequence in point of time. Two or three were added subsequent to July 15, 1957. The agreement between the parties provided, inter alia, that concurrently with the execution thereof and delivery of the route list, the lessor-plaintiff, was "disclosing to lessee [defendant] all pertinent confidential information concerning the type, nature, and amount of food and sundries purchased by customers at each stop"; and "that said Lunch Route and identity of customer stops is conclusively regarded by lessor and lessee to be and is, as between them, a trade secret." The agreement further provided that upon termination of the agreement lessee would not solicit any of the customers on the route for a period of one year. The lease was on a month to month basis but might be terminated by either party at any time for cause.

In his affidavit, Paul Cook states that during the period here in question he was a route supervisor for plaintiff; that he personally serviced some of the stops included in defendant's route, and that the employee turnover at these plants was slight; that defendant was shown the stops on his route by the driver who previously serviced the route for plaintiff and by

Cook himself; that "the type, nature and amount of food and sundries necessary to service a particular route varies from route to route in Los Angeles County; that when defendant commenced servicing the stops on his route the previous driver who had serviced the route and affiant "disclosed to defendant the type and amount of food and sundries which would be necessary for him to service the employees of the plants"; that employees of the plants on defendant's route "ordinarily would deal only with one industrial caterer at a time"; and that other caterers did not compete with defendant at his scheduled stops. Defendant was also advised as to the prices to be charged for the particular items.

In her affidavit, Mary Lou Glassburn identified herself as a catering route saleswoman; stated that she was employed by plaintiff for the purpose of servicing the route theretofore serviced by defendant; that on August 27, 28 and 29 defendant took her with him to each of the stops on his route; that defendant informed her of the time and place at which each stop was to be made; the number of persons who could be expected at each of the stops; the price he charged for each item offered for sale; what merchandise to carry, viz., the variety of sandwiches and the number of each kind; the type of pastry and the number thereof; the assortment of salads, sundries and beverages to stock in order to serve the tastes and preferences of the customers on said route. It was on the basis of this information that requirements for the following day were anticipated and the order therefor placed with the concern that furnished him his supplies. Any loss because of unsold food was defendant's under his agreement with plaintiff. According to affiant, defendant was acquainted with the customers at each stop on a name basis. During the period affiant was traveling the route with defendant, no competing catering vehicle appeared at or near the stops being serviced by defendant. All stops were in the public street except one where defendant parked on the company's property.

Although the names and addresses of the industrial concerns are in the telephone book and public directories, there is nothing in such publications, says plaintiff in his affidavit "to indicate that they are prospective industrial catering customers nor in any manner to indicate the number of employees, the times at which service would be required by the employees, or the willingness of such employees to purchase food, beverages and sundries from an industrial catering truck." Plaintiff further deposed: "By observation of the premises upon which

the employees of the various firms listed or served, one could not determine the number of employees, the times at which service would be required, their particular likes and dislikes or fancies, nor the other necessary data indicative that these were prospective industrial catering customers.'' Plaintiff also stated that defendant agreed to regard the information given him as a trade secret. The agreement was terminated on August 29, 1958, by plaintiff because defendant had had two automobile accidents within a short period and "no casualty insurance could be secured'' on the truck which he was operating.

In his affidavits and verified pleadings, defendant paints a substantially different picture. Additionally, defendant asserted that plaintiff secretly obtained a "kick back'' from the catering concern from which defendant purchased his supplies.

In seeking a reversal, defendant contends that (1) none of the information furnished defendant by plaintiff was confidential or in the nature of a trade secret; (2) the contract is invalid under the provisions of section 16600, Business and Professions Code; (3) the unclean hands doctrine precludes plaintiff from securing equitable relief in that he terminated the contract without cause and received a "kick-back'' from defendant's supplier.

In the area here involved there are, generally speaking, two groups of cases. One is the so-called "route cases'' where injunctive relief may be available. Illustrative of this group are *George* v. *Burdusis*, 21 Cal.2d 153 [130 P.2d 399] ; *California Intelligence Bureau* v. *Cunningham*, 83 Cal.App.2d 197 [188 P.2d 303] ; *Wallich* v. *Koren*, 80 Cal.App.2d 223 [181 P.2d 682], and *Reid* v. *Mass Co., Inc.*, 155 Cal.App.2d 293 [318 P.2d 54]. The other group, where it was held such relief was not available, is represented by *Continental Car-Na-Var Corp.* v. *Moseley*, 24 Cal.2d 104 [148 P.2d 9] ; *Aetna Bldg. Maintenance Co.* v. *West*, 39 Cal.2d 198 [246 P.2d 11] ; *Avocado Sales Co.* v. *Wyse*, 122 Cal.App. 627 [10 P.2d 485] ; *Mathews Paint Co.* v. *Seaside Paint & Lacquer Co.*, 148 Cal.App.2d 168 [306 P.2d 113].

As to when equitable relief may be granted, the court stated in *Alex Foods, Inc.* v. *Metcalfe*, 137 Cal.App.2d 415, 426-427 [290 P.2d 646], ". . . it is clear that if the continuance of an employer's trade depends on keeping secret the names of customers or other valuable information known to

such employer, his employee, having gained knowledge of such secrets in the course of his employment, cannot thereafter utilize such knowledge to the prejudice of. his former employer. Independent of an express contract, equity will enjoin the disclosure of confidential knowledge of trade secrets which a former employee learned in the course of his employment. The fact that a defendant was employed by plaintiff for years during which he learned the names, addresses, and requirements of plaintiff's customers justifies injunctive relief where the defendant undertook to use such information in unfair competition to the detriment of. plaintiff. Such knowledge is a part of the good will of the business and is a trade secret. A list of customers is a trade secret if there is confidential information as to such customers. To act upon it is an improper use of confidential information and amounts to unfair competition. . . . Equitable protection may be invoked against the subsequent use by a former employee of knowledge of the 'peculiar likes and fancies and other characteristics' of the former employer's customers where such knowledge will aid him in securing and retaining their business. This rule applies generally to trade route cases as well as others involving a knowledge of the customers desired for specialized information, their preferences for certain products, and their buying habits. (Citation.)''

While it is obvious that the instant case does not involve an employer-employee relationship, we believe the principles enunciated in the route cases are here fully applicable.

 Defendant's main thesis is that he received no confidential information or trade secrets from plaintiff. He argues that the industrial plants serviced by him were listed in the telephone directory and observable from the highway. It is obvious, however, that such directory or observation of the plant would not disclose (1) the number of employees, (2) the number of employees who would likely patronize a catering service, (3) the type and quality of food, beverage, and sundries which would be required, (4) the likes, dislikes, fancies and buying habits of prospective customers, (5) what plants furnished eating facilities for their employees, (6) the time to arrive and the duration of the stop, and (7) the order in which he should make the stops for the most efficient operation of the route. Such information may well spell the difference between success and failure in such a venture. Respondent aptly describes this aspect of the case as follows: "To provide service for many patrons on a profitable basis, a

schedule must be developed and adhered to strictly. . . . The driver must be at each stop on time and leave on time in order to be at the next stop when the break there begins. He must know the swiftest route from one stop to the next. He must know exactly where to park when he arrives, the customers must be ready for service on his arrival and at precisely the same time each day. These things are not readily apparent to the man who just goes out and gets a truck, loads it up and merrily drives down the highway with his telephone book at his side. They are told and shown to him by the man who has built up and developed the route, who had discovered the stops . . . arranged the stops in an orderly schedule and actually run the route, ironing out the rough edges until it is a smooth operation and really worth something.''

Defendant's argument that no trade secret was involved in that plaintiff did not furnish him with the name of any specific individual customer is without merit. This type of operation obviously does not lend itself to such detailed particularization. The ''customer'' under the facts of this case was a ''group of employees'' at a designated industrial plant at a specific time who, experience has shown, consistently purchased goods from plaintiff's truck on a day to day basis, the variety and quantity of such purchases being reasonably predictable on the basis of past experience. Each group, of course, fluctuated to some extent; an individual employee who usually bought his lunch from plaintiff's truck might be ill on any given day, or he might terminate employment at this particular plant; new workers may be taken on, and the like. However, day in and day out, the basic group of patrons remained substantially the same.

Plaintiff, of course, does not have any vested or exclusive rights to a specific parking spot on the public highway at the plants serviced by the defendant, nor does he claim any such rights. Plaintiff's complaint is based upon defendant's appropriation and use to the plaintiff's prejudice of the other information previously discussed which was made known to the defendant in confidence. This information is a real asset of plaintiff's business and the foundation upon which its success, indeed, its very existence, is built.

It is therefore clear that the evidence amply supports the trial court's determination that information in the nature of a trade secret was here present.

█ An agreement between the parties that something is a trade secret will not make of it a trade secret if in fact it is

not. However, in the present case, we have both an actual trade secret plus an agreement by defendant to treat the information received from plaintiff as a trade secret and to hold such inviolate. Furthermore, such information was deemed by defendant as essential to the successful operation of the route, as appears from the affidavit of Mary Lou Glassburn summarized in the statement of facts.

Defendant argues that the case of *Fortna* v. *Martin*, 158 Cal.App.2d 634 [323 P.2d 146], is controlling. In that case the court held that information the defendant had obtained in his employment in a termite control business, which included the manner in which his employer secured business, knowledge that financial institutions required a termite clearance before making loans on improved property, knowledge of the materials used and services performed in termite control work, and of the employer's method of making estimates and fixing prices was not confidential information, being readily ascertainable. As already discussed, plaintiff's scheduling of stops, the quantity and variety of food, drink and sundries to be carried, and other related information disclosed to the defendant was not readily ascertainable as was the information in the Fortna case.

Defendant's argument that his contract with plaintiff violated section 16600, Business and Professions Code, is without merit. Under this section, "a contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." In the instant case there is no promise or agreement by the defendant that, after the termination of the contract, he would not engage in any profession, trade, or business. The contract merely provided that defendant would not solicit those customers made known to him in confidence. Such an agreement is not rendered invalid by section 16600. The following language in *Gordon* v. *Wasserman*, 153 Cal.App.2d 328, 330 [314 P.2d 759], is apposite: "It clearly appears by the terms of the contract that it does not prevent defendant from carrying on a weekly credit, or any other business. He covenants not to use plaintiffs' confidential lists to solicit customers for himself. Similar covenants have been held valid and enforceable. . . ." This principle was reaffirmed in *Gordon* v. *Landau*, 49 Cal.2d 690, 694 [321 P.2d 456].

Defendant next argues that plaintiff should be denied equitable relief for, asserts defendant, plaintiff has not alleged any cause for terminating the lease. The agreement in this

respect provided: "This lease shall continue from month to month but may be terminated by either party at any time for cause." In his affidavit, plaintiff deposed that "said written agreement was terminated on or about August 29, 1958 because the defendant had two automobile accidents within a short period and no casualty insurance could be secured by your affiant on the truck which he was operating." This was sufficient to justify the termination of the contract.

■ Defendant also contends that plaintiff received a kick-back from the catering company which furnished defendant his supplies and, because of this fact, plaintiff should be denied equitable relief. Whether or not plaintiff in fact received such a kick-back was, of course, a question of fact. The trial court apparently resolved this question adversely to defendant. Because of defendant's obvious interest, the court was not required to give full credence to his assertions even though such were not contradicted by opposing affidavits. (*Smith* v. *Smith*, 157 Cal.App.2d 658, 662 [321 P.2d 886]; *Hill* v. *Thomas*, 135 Cal.App.2d 672, 681-682 [288 P.2d 157].)

Finally, it should be noted that this is an appeal from a preliminary injunction only. ■ As stated in *Isthmian S.S. Co.* v. *National Marine etc. Assn.*, 40 Cal.2d 433, at page 435 [254 P.2d 578]: "Whether a preliminary injunction shall be granted rests largely in the discretion of the trial court and will not be reversed on appeal unless there is a manifest abuse of discretion." In *Sommer* v. *Metal Trades Council*, 40 Cal.2d 392 [254 P.2d 559], the court discussed the trial court's exercise of discretion as follows (p. 402): "On the application for the preliminary order the court also could, and undoubtedly did, weigh the probable injury which would ensue to the plaintiff by denying the temporary relief as against the absence of probable injury which would accrue to the defendants by granting it. The record does not indicate that the court abused its discretionary power in making these determinations adversely to the defendants and in granting the injunctive order pending a trial on the merits." Likewise, in the instant case, it cannot be said that there was an abuse of discretion.

The order is affirmed.

Ashburn, J., and Herndon, J., concurred.