[Civ. No. 18270. First Dist., Div. One. Oct. 13, 1959.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY (a Corporation), Plaintiff and Appellant, v. WARREN DEMPSTER et al., Defendants and Appellants.

David C. Bogert, Long & Levit, Bert W. Levit and Victor Levit for Plaintiff and Appellant.

McFarland & Ferdon and John P. McFarland for Defendants and Appellants.

TOBRINER, J.—An injunction against former agents of an insurance company which prohibited solicitation of policyholders by these agents and use of information obtained in the course of their former relationship does not fail because of ambiguity in the contract of appointment or because of adverse equitable considerations or statutory prohibition. The injunction properly required that the agents return certain unused material to the company. The court correctly awarded to the agents "termination benefits" which represented compensation for past services.

State Farm Mutual Automobile Insurance Company, hereinafter designated "State Farm," filed its complaint against 13 of the former agents, hereinafter designated "Agents," seeking to enjoin for one year their use of information acquired while representing that company. Praying likewise for similar relief against Meritplan Insurance Company, State Farm asked for an accounting and damages against all defendants.

State Farm undertakes principally the business of underwriting automobile bodily injury and property damage liability as well as automobile physical damage insurance. According to the testimony of its executive vice-president, it is the largest carrier of automobile insurance in the world.

The Agents, licensed as insurance agents under the law of

the state, serve under a contract entitled "Local Agent's Appointment" prepared by State Farm, the pertinent portions of which are set out in this opinion *infra*. State Farm gave the Agents no opportunity to negotiate the contract but only the choice of accepting it or suffering the termination of their agencies.

Prior to April of 1957, State Farm terminated the agency contracts of 12 appellant Agents. It cancelled their contracts because they refused to resign agency appointments which, without the consent of State Farm, they had obtained from other insurance companies. In June, it terminated the other Agent's contract because he refused to procure his wife's resignation of her agency appointment with another insurance company.

After such termination and immediately prior to the expiration date of the policies of their former clients, the Agents proceeded to advise these clients not to renew their insurance with that company. The Agents thus retained a substantial portion of this business. And, at least in the case of one Agent (Dempster), some of his clients thought he still represented State Farm and purchased insurance under this impression, giving Dempster checks payable to State Farm. Dempster, however, placed the insurance with other companies.

In order to curtail this solicitation of State Farm policyholders and to obtain complete records to turn over to new agents for servicing policyholders, State Farm claimed that under the contract it was entitled to the Agents' master files. These files contained the vital data regarding insurance of each policyholder. State Farm admitted it also desired the files because they might contain information State Farm did not possess. While the Agents purchased the master file folders from State Farm, the Agents themselves developed information contained in them.

The court gave judgment: (1) enjoining the Agents from interfering with those policyholders of State Farm whom the Agent had serviced, for a period of one year from the date of termination of the respective Agents; (2) enjoining, for the one-year period above, these Agents from imparting to any insurance company, broker, or agent, information received or developed by themselves while representing State Farm, respecting policyholders assigned to the respective Agents; (3) enjoining the Agents forever from selling to persons whom the Agents knew to "erroneously believe . . . [the Agents were] insurance agents" of State Farm or from rep-

resenting themselves as such Agents; (4) ordering the Agents to deliver to State Farm "all records, files, manuals, blanks, forms, materials and supplies furnished to the agent by the Company or on its behalf"; (5) allowing the Agents to sell to their former clients who came to them unsolicited; (6) ordering State Farm to pay termination benefits to the Agents; and (7) dismissing the suit against Meritplan Insurance Company.

Both State Farm and the Agents have appealed.

We discuss the validity of three principal rulings of the trial court which emerge from these facts: (1) the injunction against the Agents' solicitation of former policyholders; (2) the order to the Agents to return materials received from State Farm; and (3) the award of termination benefits to the Agents.

While State Farm urges that the first problem is moot because two of the three provisions of the injunctive relief limited the prohibition to one year from termination of the agency, and that year has now expired, the third provision of the injunction was not so limited. Moreover, the injunctive provisions are interrelated, as, indeed, are all three of the above topics. We therefore first proceed to discuss the injunctions.

The Agents' contention that they can freely and lawfully compete with State Farm for the business represented by expirations and that no injunction should have been issued to prevent for a period of one year their solicitation of former policyholders serviced by them calls for an examination of the nature of the State Farm's asserted protected interest, the contract which clothed this interest, and the validity of the trial court's enforcement of the contract and protection of that interest.

State Farm asserts that the Agents come into possession of the "most vital trade secrets" of the company: information consisting of "the names, addresses and telephone numbers of policyholders, the amounts and types of insurance purchased from . . . [State Farm] and its affiliated companies, due dates of premiums and the amounts thereof, the character, description and location of insured property, the make and model of insured automobile and personal information as to the insured, such as age, birth date, physical condition, dependents, automobile drivers, driving records, financial and credit standing, and particularly the renewal and expiration dates of policies in force." The Agents neces-

sarily and inevitably acquired the information in the course of their relationship with the company, and the possession of it opened the company to competitive attack at that most dangerous moment, the expiration date of the policies. The court found (paragraph XV) that the "information thus obtained" was "in the nature of . . . trade secrets." The company seeks to seal this information in the protective insulation of equity.

The company's contract with the Agents carried two provisions which apparently sought to insure this protection. Section I.G.[1] provided that "[u]pon termination of this agreement" the agent "shall thereafter refrain from further solicitation for or servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders." Section IV.B.4[2] stipulated that termination benefits be paid to the agent provided "the Agent has agreed in writing not to service policyholders of the Company or to compete with the Company or interfere with its business for one full year from the date of termination."

The Agents claim these provisions of the contract are ambiguous and unenforceable. Initially we point out that the trial court found no such ambiguity in the contract. Recognizing that we may not override that court's construction unless it is unreasonable (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942), 20 Cal.2d 751, at 772 [128 P.2d 665]), we examine the Agents' two arguments:

---

[1]The provision reads in full: "G. All records, files, manuals, blanks, forms, materials and supplies furnished to the Agent by the Companies, or on their behalf shall be and remain the property of the Companies, and the Agent shall be deemed the bailee thereof for the use and benefit of the Companies and shall safely keep and preserve such property except as consumed in normal agency operations. Upon termination of this agreement, the Agent shall deliver to the Companies or their authorized representative all such property remaining in the Agent's possession or control and shall thereafter refrain from further solicitation for or servicing of policyholders of the Companies and from interfering in any way for a period of one year with existing policies and policyholders."

[2]The provision reads in full: "4. Payment to the Agent under the provisions of B may be made in 5 annual installments or less, at the option of the Company, the first payment to be made within 90 days following the date of termination provided all records and files used by the Agent in his representation of the Company and all unused materials and supplies furnished to him by the Company have been surrendered to the Company or its authorized representative and provided the Agent has agreed in writing not to service policyholders of the Company or to compete with the Company or interfere with its business for one full year from the date of termination."

■ (1) The Agents contend that the contract provides that only "records" and "supplies" "furnished to the Agent by the Companies" shall "remain the property of the Companies" and that this mandate does not apply to the business or information obtained by the Agents themselves. However, the equitable protection extends to confidential trade information "whether prepared by the employer or by the employee." (1 Nims, The Law of Unfair Competition and Trade-Marks [4th ed., 1947], § 157, p. 436.) The reference to the employment relationship does not exclude the confidential relationship between independent contractors. (*Gordon* v. *Landau* (1958), 49 Cal.2d 690 [321 P.2d 456]; *Ingrassia* v. *Bailey* (1959), 172 Cal.App.2d 117 [341 P.2d 370].)

■ (2) The Agents contend that the language of the contract specifies only that the terminated agent may no longer deal with State Farm as to its policies, not that he cannot solicit a State Farm policyholder as to insurance with another company, and that the custom of the industry supports this interpretation. The language of the contract, reading, "Upon termination of this agreement, the Agent shall . . . refrain . . . from interfering in any way for a period of one year with existing policies and policyholders" obviously aims to protect the company at the vulnerable time of renewal of the policy. Policies are not cancelled during the life of the contract but at their termination, and it is to this date that the prohibition against "further" solicitation or "interference" must apply. It is true, as the Agents suggest, that this language differs from that used in contracts or arrangements made under the so-called American Agency System, but, as the Agents state, " [I]t is State Farm policy to deal with its insureds only through its own agents and employees." We deal here with the specifics of a State Farm policy and contract, and whatever its fairness to the agent, we are bound by the consummated arrangement.

We conclude that the State Farm method of operation (see *Hedlund* v. *Farmers Mutual Automobile Ins. Co.* (1956), 139 F.Supp. 535, for an explanation of an analogous plan) as embodied in its contract cannot be varied by custom or usage (*Partridge* v. *Phoenix Mut. Life Ins. Co.* (1872), 15 Wall. (U.S.) 573 [21 L.Ed. 229]; *Port Invest. Co.* v. *Oregon Mut. Fire Ins. Co.* (1939), 163 Ore. 1 [94 P.2d 734, 124 A.L.R. 1342]) and that the interpretation of the trial court is entirely reasonable and must stand.

■ We turn to the trial court's enforcement of the contract and protection of State Farm's alleged trade secrets. Because a prohibition against "interfering" with State Farm's "existing policies and policyholders" would be so extensive that it would jeopardize the Agent's ability to engage in insurance brokerage at all, the trial court enjoined the Agents only from interfering with those policyholders of State Farm whom the Agent had serviced.

The insistence of the company here upon protection against the Agents' use of the acquired information, its reliance upon equity's sensitivity to abusive manipulation of a confidential relationship, and its argument that the relationship itself creates the right in the company and the corresponding obligation in the Agent, contrasts with the Agent's reliance upon the unrestricted right to compete for business and the freedom of the individual to earn his own livelihood. The conflict is as old as the struggle between the individual rights demanded and protected in the frontier community and the abridged interrelated ones imposed by a society becoming more contracted and complex. Probably because of the strength of these competing values the decisions have turned not alone upon what the parties have written in their contracts but upon the nature of the interests the parties seek to protect: whether these are truly a kind of trade secret or trust, a unique or specialized knowledge gained through the confidential relation, a particular "trade route," or general and fairly easily obtainable information related to the sales of "a product or service, public acceptance of which depends almost entirely on the price or superiority of the product or service as compared with what is being offered elsewhere on the market." (Hays, *The California Law of Unfair Competition Takes a Turn—Against the Employer*, 41 Cal.L.Rev. [1953], p. 38 at 61: an excellent analysis.)

The Agents' contention that their freedom to compete finds sanction in section 16600 of the Business and Professions Code and that the company's sought protection conflicts with that statute merely states the issue in another form. The code section provides: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." ■ This provision does not invalidate the protection of the trade secret or trust. Prohibition of a contract forbidding one from engaging in business is not prohibition from solicitation of customers made known to

him in confidence. The essence of the protected interest is the trade secret or trust. The contract of the parties is not decisive in establishing the interest; the contract cannot make a trade secret out of a situation where none exists; the interest itself as developed from the accepted relationship of the parties must be determinative. Thus *Fortna* v. *Martin* (1958), 158 Cal.App.2d 634 [323 P.2d 146], affords the test: "[T]he evidence . . . [failed to disclose] the use of any information by Martin which can be considered to be a trade secret or confidential." (P. 639.) *Morris* v. *Harris* (1954), 127 Cal.App.2d 476 [274 P.2d 22], finds no fiduciary relationship violated by a janitor "who after leaving the employer's service accepts employment from the employer's customers without solicitation on his part." (P. 478.)

 In our case the very recital of the nature of the information acquired by the salesman and the unique interest of the company in the information, places it in the category of the trade secret and supports the finding of the trial court to that effect. Two recent decisions confirm this position.

In *Gordon* v. *Landau* (1958), 49 Cal.2d 690 [321 P.2d 456], the Supreme Court held that a list of "plaintiffs' preferred customers" is a "real asset to their business and . . . a valuable trade secret." (P. 694.) In that case the defendant had been employed as a collector-salesman by the plaintiffs whose business consisted of selling merchandise to housewives at their homes. Following the termination of employment with the plaintiffs, the former employee entered into competition with the plaintiffs. Having acquired the information as to the customers from the lists which defendant had previously obtained from the plaintiffs, the defendant proceeded to solicit plaintiffs' better customers. Upon being enjoined from such conduct defendant appealed, claiming that Business and Professions Code, section 16600, invalidated his covenant not to solicit these customers for one year. In affirming, the Supreme Court, in a unanimous opinion, stated the "contract . . . did not prevent defendant from carrying on a . . . business [similar to the plaintiffs']. . . . He merely agreed not to use plaintiffs' confidential lists to solicit customers for himself for a period of one year following termination of his employment. Such an agreement is valid and enforceable. . . . [Citing cases.]" (P. 694.)

Likewise, *Ingrassia* v. *Bailey, supra* (1959), 172 Cal.App. 2d 117, follows Gordon in holding that information regarding

the particularities of the trade of customers of an industrial catering route constituted an enforceable trade secret.

The court properly limited the enforcement of the contract to the exact and limited interests which equity protects. It prohibited interference with existing policyholders of State Farm whom the Agents had serviced. It cut the contractual cloth to the special equitable pattern of the trade secret, thus following the rule that a construction of a noncompetitive covenant to render it lawful is preferable to an interpretation causing the opposite result. (*General Paint Corp.* v. *Seymour* (1932), 124 Cal.App. 611, 615 [12 P.2d 990]; Civ. Code, § 1643.)

This limited enforcement does not conflict with decisions which the Agents cite for the proposition that section 16600 bars such a remedy. They place their main reliance on *Continental Car-Na-Var Corp.* v. *Moseley* (1944), 24 Cal.2d 104 [148 P.2d 9], a case in which the district manager of a business which manufactured and sold cleaning compounds and floor wax left that firm to establish a rival company and then solicited his former firm's customers. The court refused injunctive relief against the solicitation because (1) the evidence did not show defendants were using a "secret process" or formulae belonging to plaintiff; (2) the names and addresses of the firms using products of plaintiff were well known to the trade and to other salesmen; (3) plaintiff company had been in open competition with other manufacturers for years; hence the list of customers could not be held to be a trade secret or "confidential" information; (4) defendant had not been selling upon the basis of a friendly feeling between himself and his customers nor because of his personal acquaintance with their peculiar likes, fancies or requirements but rather on his ability to meet or excel, in their judgment, the quality, price and adaptability of similar products offered by his competitors. In the instant case the unique nature of the information which imparted a special knowledge of the customer's insurance habits and expiration dates to the salesman distinguishes it from the case, like the cited one, whose characteristic is competition of product on the open market.

Defendant's citation of *Chamberlain* v. *Augustine* (1916), 172 Cal. 285 [156 P. 479], and *Davis* v. *Jointless Fire Brick Co.* (1924, 9th C.C.A.), 300 F. 1, is unavailing because these cases involve the tests of legality applicable to general prohibitions of competition by one party with another rather

than those pertinent to special protection against prejudicial use of confidential information imparted by one party to another.

Our analysis thus leads us to uphold the first two injunctive provisions of the judgment. The third perpetually enjoined the Agents from selling insurance to policyholders where the Agents have knowledge such policyholders erroneously believe that the Agents are agents of State Farm and from falsely representing themselves to be such agents. This provision, however, should not have embraced all defendants.

■ The evidence indicated that only Agent Dempster engaged in such misconduct. While the court thus properly enjoined Dempster, the injunction should not sweep all the defendants into so wide a net. That plaintiff joined the other defendants with Dempster in the same action does not subject them to the same penalty. (*Keyes* v. *Little York Gold Washing & Water Co.* (1879), 53 Cal. 724, 731.) State Farm produced no evidence to prove that the other 12 defendants threatened to sail under the colors of a falsely asserted agency.

Turning next to the order of the trial court requiring the Agents to return certain materials to State Farm, we quote the pertinent provisions of the contract: "All records, files, manuals, blanks, forms, materials and supplies *furnished* to the Agent by the Companies or on their behalf shall be and remain the property of the Companies, and the Agent shall . . . safety keep and preserve such property *except as consumed* in normal agency operation. Upon termination of this agreement the Agent shall deliver to the Companies . . . all such property remaining in the Agent's possession or control. . . ." (Emphasis added.)

The Agents first argue that the contract requires only the return of records "furnished to" the Agent by State Farm and does not apply to records prepared by the Agents. The court order, however, specified records so "furnished" and did not incorporate records developed by the Agents.

■ The Agents secondly contend that the court, by ordering them to "deliver to plaintiff . . . all records, files, manuals, blanks, forms, materials and supplies furnished to the agent by the Company or on its behalf . . .," required the Agents to return supplies consumed in the normal operation of the agency. State Farm states that only "all such property remaining in the agent's possession or control" is

to be returned by defendants. Such a construction is the only rational interpretation of the court's order. A reading of Section I.G. of the contract indicates that the use of blank forms would constitute consumption in the normal operation of the agency.

█ Finally we consider the problems involved in the award of termination benefits. While State Farm complains that the Agents are not entitled to termination benefits because the Agents failed to perform the alleged precedent condition to such payment, we concur with the contrary conclusion of the trial court.

The contract provides that the agent received a monthly service fee equal to 10 per cent of net premium collections received by State Farm during the sixth preceding month on policies credited to that agent. In substance, this was equivalent to a 10 per cent commission on business produced by the agent, payment of which was deferred for six months. Indeed, State Farm's president had informed the agents that these service fees would in the future be paid currently after the company had installed IBM machines, rather than on the basis of payments received six months before, but at the date of the trial such coincidence had not been attained.

Upon termination of the agency contract the agent does not receive any further service fees, but does receive substantially lower so-called termination benefits. For example, the testimony discloses that one of the agents, Thomas Moore, if his agency with State Farm had continued, would have received in service fees for the time which intervened between the sixth preceding month and the date of termination about $4,000. His termination benefits, on the other hand, amounted to $601.45. The termination benefits are, then, compensation in far lower amounts than otherwise payable if services had continued.

The alleged nonperformance of the conditions should not work a forfeiture of the past earnings. In the first instance the trial court, through the exercise of its equitable powers, ordered future compliance as to the conditions of the contract; hence State Farm obtained through the decree the future equitable protection which it sought. Since State Farm thus obtained full prospective performance of the contract the Agents should not be deprived retroactively of compensation earned under the contract.

In the second instance State Farm's contentions as to noncompliance with the conditions are not persuasive. Although

State Farm complains that the Agents did not return "records" and "unused materials" State Farm obtained substantial compliance with the conditions of the contract as to return of such materials. The court required the return of unused records and materials. The court did not, and could not, require the return of the used materials and the contract itself did not contemplate such return.

In the third instance the alleged unascertainable losses of State Farm could not properly be set off against the ascertainable termination benefits. The trial court found the evidence insufficient to form any basis for the computation of damages to plaintiff; that any such damages were speculative. The Agents then could have brought a separate suit for termination benefits and the company would not have been in a position to establish an effective offset.

We affirm the judgment with the modification that the paragraph which provides that defendants "are forever restrained and enjoined from taking applications for insurance policies from and from selling insurance to policyholders or prospective policyholders where said defendants have knowledge at the time that such policyholders erroneously believe defendants are insurance agents of plaintiff and from falsely representing themselves in any way as continuing to be authorized as agents or representatives of plaintiff" shall apply to defendant Dempster only.

Bray, P. J., and Wood (Parker), J., concurred.

The petitions of plaintiff and appellant and defendant and appellant Dempster for a hearing by the Supreme Court were denied December 10, 1959.