[Civ. No. 70023. Second Dist., Div. Three. Sept. 27, 1984.]

RICHARD E. HESTON, Plaintiff and Respondent, v.
FARMERS INSURANCE GROUP et al., Defendants and Appellants.

COUNSEL

Gibson, Dunn & Crutcher, Fred G. Bennett and Ginger G. Bauer for Defendants and Appellants.

Perona, Langer, LaTorraca & Beck, Major A. Langer and Jon S. Heim for Plaintiff and Respondent.

OPINION

**KLEIN, P. J.**—Defendants and appellants Farmers Insurance Group et al. (Farmers) appeal the denial of a requested injunction against plaintiff and respondent Richard E. Heston (Heston).

The judgment is affirmed because the trial court properly admitted parol evidence to ascertain the meaning of an ambiguous agreement, and thereupon made a reasonable interpretation of the agreement favoring Heston over Farmers.

### PROCEDURAL AND FACTUAL BACKGROUND

This case concerns the respective rights of Heston as an insurance agent and Farmers as an insurance company upon termination of the relationship.

Heston first became a part-time agent in an apprenticeship for Farmers under a reserve appointment agreement entered into in July 1976. On November 27, 1976, Heston entered into an agent appointment agreement (Agreement) with Farmers, a standard form contract used by Farmers with its career agents who sell insurance exclusively for Farmers. Heston sold Farmers' insurance policies out of an office rented by him. He also paid his own business telephone, utilities, mailing, advertising, part-time solicitor and full-time secretary.

1. *The Agreement and Open End Credit Plan (Credit Plan).*

The Agreement set forth a noncompetition covenant upon the termination of the relationship, and a designation that all files and policyholder records be turned over to Farmers at such time.[1] One of the disputes in the current litigation is whether these covenants were automatic upon the termination, or whether consideration must have passed from Farmers to the agent, and have been accepted, before the covenants took effect.

The terms of the Agreement also specified a formula for calculating the "contract value" of an agency, based upon service commissions paid to the agent in the preceding six or twelve months, the number of active policies attributable to the agent and the number of years of continuous agent service.

---

[1]Paragraph H of the Agreement provided: "The Agent agrees to transfer and assign all of his interest under this Agreement and Agency (including any interest in the telephone numbers and leased or rented office location) to the Companies [Farmers] or any other purchaser *in the event they make payment to the Agent* pursuant to Paragraph G of this Agreement. For the payment received, he further agrees that for a period of one year following the date of sale he will neither directly nor indirectly solicit, accept, or service the insurance business of any policyholder of record in the agencies of this district as of the date of sale. The Agent acknowledges that all manuals, lists and records of any kind (including information pertaining to policyholders and expirations) are the confidential property of the Companies and agrees they shall not be used or divulged in any way detrimental to the Companies and shall be returned to the Companies upon termination of the Agency." (Italics added.)

The Agreement further provided in paragraph I: "Nothing contained herein is intended or shall be construed to create the relationship of employer and employee; rather, the Agent is an *independent contractor for all purposes.*" (Italics added.) An "Explainer" used "to further clarify the provisions of the Agreement" stated, "You are an independent businessman and your own boss. You determine your own destiny."

The Farmers Insurance Group Credit Union (Credit Union) made the Credit Plan available to Farmers' agents. Agents were entitled to obtain loans secured, inter alia, by the contract value of their agencies. Heston signed a Credit Plan agreement on September 17, 1981, and on December 30, 1981, he obtained a loan of $7,297.65.

One of the provisions of the Credit Plan provided that upon termination of an agent's Agreement with Farmers, all advances were immediately due and payable, and Farmers was authorized to pay off the loan balance *"from any sums due . . . under the terms of . . . [the] Agreement."* (Italics added.) Another clause set forth that any such payments would constitute contract value for all purposes under the Agreement, including, but not limited to, the payment of consideration for the noncompetition covenant.

## 2. *Procedural Events.*

In a letter dated December 20, 1982, Heston was notified by Farmers that he would be terminated in 30 days. The termination date specified was January 24, 1983.

Following his termination, Farmers offered Heston an amount for his agency purported to be the contract value. On January 18, 1983, Farmers sent the Credit Union a check for $5,404.51, to pay off the balance on Heston's loan.

In a letter to a Farmers' manager dated January 20, 1983, Heston stated that he was refusing contract value and would be retaining ownership of his policyholders' information, expirations, and all pertinent and privileged contents of the files.

In a letter dated January 24, 1983, a Farmers' regional sales manager informed Heston that his contract value had been computed as $20,100, and that he would be paid that amount in three instalments less the $5,404.51 paid to the Credit Union. The first instalment was enclosed. The letter also stated that all provisions of paragraph H of the Agreement would be exercised.

Heston filed a complaint in the superior court on January 31, 1983, seeking declaratory relief and requesting a temporary restraining order and injunction to prevent Farmers from removing the policyholder files, using information on the policyholders obtained by Heston prior to January 24, 1983, in any way that would assist another in soliciting the insurance business of such policyholders, soliciting such policyholders, and interfering with Heston's correspondence with the policyholders.

Farmers, in turn, sought a temporary restraining order and injunction enforcing the one-year negative covenant, compelling nonuse of the policyholder file information and enjoining the servicing of Farmers' policies.

The trial court granted Heston's injunction, contingent on the posting of a $100,000 bond, and denied Farmers' requested injunction. Heston was unable to post the bond. Farmers appealed the denial of its motion for preliminary injunction.

## CONTENTIONS

Farmers contends the trial court erred in denying its motion for injunctive relief against Heston's servicing of Farmers' policies held by Heston's customers and his retention and use of policyholder information, because the tender of contract value was sufficient to activate the covenants, and because the Credit Plan was in effect an assignment of Heston's right to contract value.

Heston counters that the denial of the injunction was proper, and in any event the issue of the noncompetition covenant is now moot.

## DISCUSSION

Preliminarily, we point out that part of the injunctive relief requested by Farmers is now moot, in that the one-year period specified in the noncompetition covenant clause has passed. (See *Covina U. H. School* v. *Interscholastic Fed.* (1934) 136 Cal.App. 588, 589 [29 P.2d 323]; *Kenneally* v. *Knox* (1960) 184 Cal.App.2d 262, 266 [7 Cal.Rptr. 370].) However, because the Agreement provisions are interrelated, we shall discuss all provisions involved in the requested injunctive relief. (*State Farm Mut. etc. Ins. Co.* v. *Dempster* (1959) 174 Cal.App.2d 418, 422 [344 P.2d 821].)

1. *Standard of Review.*

The rule is that the trial court's interpretation of the written contract must be found erroneous before a reversal may occur. (*Sayble* v. *Feinman*

(1978) 76 Cal.App.3d 509, 512-513 [142 Cal.Rptr. 895].) If the trial court properly admitted evidence to aid in the interpretation of the Agreement, we must adhere to the trial court's interpretation. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) However, we are not limited by the trial court's finding of contractual ambiguity, if that determination was based upon incompetent evidence. (*Id.*, at p. 865.)

Here, the trial court's interpretation was based on properly admitted evidence, and therefore we uphold its ruling.

2. *Interpretation of the Agreement.*

 The trial court considered the terms of the Agreement itself and found ambiguity.

Pertinent provisions, in addition to paragraphs H and the part of I cited above, include paragraphs C and G.[2] Paragraphs C, G, and H together purport to establish the rights of the parties upon termination of the Agreement. What was in dispute were the rights and obligations of the parties under the contract value provisions (paragraph G) and the noncompetition clause and policyholder records provisions (paragraph H).

The first sentence of paragraph G provides, "In the event of termination, the Companies will *normally* pay 'Contract Value' to the Agent or his heirs in the manner hereinafter set out." (Italics added.) The word, "normally" is not expressly defined. The next sentence states that if Farmers does not pay the "Contract Value," the agent or his heirs may nominate a successor.

Farmers argues that Heston's exclusive options under the Agreement were to accept contract value or to nominate a successor, while Heston claims that he was also entitled to refuse contract value.

Heston's argument is based on the express language of paragraph H. The first sentence provides that "[t]he Agent agrees to transfer and assign all of

---

[2]"C. This Agreement terminates upon the death of the Agent and may be terminated by either the Agent or the Companies on three (3) months written notice. [¶] If the provisions of this Agreement are breached by either the Agent or the Companies, the Agreement may be terminated by the other party on thirty (30) days written notice. This Agreement may be terminated immediately by mutual consent or by the Companies for the following reasons: [¶] . . . . [¶] G. In the event of termination of this Agreement, the Companies will normally pay 'Contract Value' to the Agent or his heirs in the manner hereinafter set out. If the Companies do not pay the 'Contract Value,' the Agent or his heirs may, in writing, nominate a successor(s). Such nominee(s) must be acceptable to the Companies, and be ready, willing, and able to operate the Agency within thirty (30) days of termination of this Agreement. [¶] The Agent, or his heirs, may negotiate with such nominee(s) for the purchase of his interests under this Agreement, but the sale price shall in no event exceed the 'Contract Value.'"

his interest under this Agreement and Agency . . . to the Companies or any other purchaser in *the event they make payment to the Agent pursuant to Paragraph G of this Agreement.*" (Italics added.)

The second sentence thereof sets forth that "*[f]or the payment received, he further agrees that for a period of one year following the date of sale he will neither directly nor indirectly solicit, accept, or service the insurance business of any policyholder of record in the agencies of this district as of the date of sale.*" (Italics added.)

The third and last sentence of the single paragraph H states that "[t]he Agent acknowledges that all manuals, lists and records of any kind . . . are the confidential property of the Companies and agrees they shall not be used or divulged in any way detrimental to the Companies and shall be returned to the Companies upon termination of the Agency."

a. *Meaning of contract value.*

The express language of two sentences of paragraph H includes a provision concerning "payment" to Heston. Farmers urges that Heston was "paid" for purposes of activating these covenants because Farmers (1) paid off part of a Credit Union loan secured by his contract value, and (2) tendered payment of the remaining amount of Heston's contract value, even though Heston refused to accept the tender.

Farmers' first argument is based not upon the provisions of the Agreement itself, but upon a provision in Heston's Credit Plan contract with the Credit Union as follows: "Upon termination of my Appointment Agreement by either me or the Companies, the advances which this plan secures by virtue of any right, . . . to said . . . Agreement shall become immediately due and payable, and the Companies are authorized to pay to you the balance due . . . from any sums due or to become due me under the terms of my . . . Agreement. I agree that any payments so made to you shall constitute payment of Contract Value for all purposes under said . . . Agreement including, but not limited to, the payment of consideration for a noncompetition covenant of mine."

Whether the provisions in the Credit Plan, admittedly signed by Heston, can be relied upon by Farmers to bind Heston to the promises elicited by paragraph H of the underlying Agreement depends on the interpretation of paragraph H and the controlling paragraph in the Credit Plan. This latter paragraph will be discussed in detail below under point 4. However, we find Farmers argument in this regard unconvincing for certain obvious reasons.

b. *Other ambiguous terms.*

Both Heston and Farmers offered parol evidence on the meaning of disputed terms. The trial court found the Agreement "ambiguous" and admitted the extrinsic evidence to aid in its interpretation.

■ The test of admissibility of parol evidence is whether such evidence is "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

■ In view of the overall organization of the Agreement, the inclusion of the three sentences of paragraph H in a single paragraph, and the sentence in paragraph I concerning an agent's "independent contractor" status, we do not find that the trial court was in error in finding the Agreement ambiguous, or reasonably susceptible of more than one meaning. Therefore, meaning of the terms thereof was properly to be determined using any relevant and admissible parol evidence.

c. *Admissibility of parol evidence.*

■ Heston offered evidence to the effect that a reasonable interpretation of the Agreement would be that he had the option of refusing contract value and continuing his business intact.

Heston indicated in a declaration that a Farmers' district manager represented to him, during the course of soliciting him to become an agent, that Heston would be an independent businessman, own his own policies and be able to sell, keep or dispose of the business as he saw fit. On this same point, Heston offered the Explainer, which contained the representation "You are an independent businessman and your own boss." ■ Such express representations made during negotiations are clearly relevant to the determination of the meaning of an ambiguous contract. (Code Civ. Proc., §§ 1856, 1860; Civ. Code, § 1647; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665]; *Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].)

■ Farmers countered that Heston was aware of its' interpretation of the contract value provisions. A declaration by one Rogers, Farmers' district manager, contained an allegation that Heston was told, prior to signing the Agreement, that upon termination he would be obligated to return files and records, and would be prohibited from competing with Farmers for one year. Even assuming the truth of the allegation, it does not contradict the

trial court's finding that such duties would arise only if Heston opted to accept contract value.

Farmers also offered in evidence a letter sent by Farmers' regional manager to Heston and other agents on January 25, 1982, informing them that "Paragraph H establishes, as part of our contractual arrangement, that upon *tender of* payment of contract value the agent is required to transfer all of his or her interest in the agency to the Companies and to refrain for a period of one year from soliciting, accepting or servicing the insurance business of the Companies' policyholders in the terminated agent's former district." (Italics added.)

Farmers contends that this letter, along with an alleged phone conversation between Rogers and Heston later that year after Rogers heard that Heston was "thinking about terminating," are competent evidence of Heston's acquiescence to Farmers' interpretation of the provision. In that conversation Rogers "allegedly reminded" Heston of the nature of the files and the noncompetition clause.

In the January 25 letter, however, Farmers admitted that "[s]everal recent Agency terminations have resulted in legal actions by Farmers against former agents who have terminated and refused contract value."

While evidence of the actions of the parties subsequent to an inquiry because of an ambiguous contract may be considered in interpreting an agreement, this allowance is qualified by a restriction that the actions to be considered occur before a dispute has arisen. (See *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 296-297 [85 Cal.Rptr. 444, 466 P.2d 996].)

A dispute over the terms of the Agreement clearly had arisen at the time the January 25 letter was sent, even if no dispute between Heston and Farmers had yet occurred. Farmers cannot impose its own interpretation six years after the signing of the Agreement, after it had become apparent that paragraph H presented a problem, and now claim that Heston's failure to respond indicates his acquiescence.

The trial court also admitted several items of evidence, objected to by Farmers, which indicated that Farmers' own interpretation of paragraph H of the Agreement was in accordance with the meaning offered by Heston.

The most damaging evidence offered to support the interpretation that Heston would have the option of refusing contract value was contained in a brief filed by Farmers' counsel before the National Labor Relations Board (NLRB) in 1973. Properly judicially noticed by the trial court under Evi-

dence Code section 452, subdivision (d), Farmers' brief argued at great length that agent signatories of an agreement with a paragraph identical to the one in the Agreement here had the option of refusing contract value and competing with Farmers.[3]

■ Farmers maintains such evidence was inadmissible and irrelevant evidence of unilateral intent of a party not disclosed to the other party to the contract. (See, e.g., *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; *Ellena* v. *State of California* (1977) 69 Cal.App.3d 245, 262 [138 Cal.Rptr. 110]; *City of Mill Valley* v. *Transamerica Ins. Co.* (1979) 98 Cal.App.3d 595, 602-603 [159 Cal.Rptr. 635].) This argument is misplaced.

■ This general rule arose out of the objective theory of contract which declared the subjective intentions of the parties immaterial because the manifestation of intention was what controlled. (*Brant* v. *California Dairies, Inc., supra,* at p. 133; 7 Wigmore, Evidence (Chadbourn rev. ed. 1978) § 1971, pp. 150-152.) The rationale behind this evidentiary rule is to prevent "extrinsic utterances" from competing with the words of an integrated document. (9 Wigmore, Evidence (Chadbourn rev. ed. 1981) §§ 2466, 2471, pp. 229, 238-239.)

The exception to the rule permits evidence of intent to assist in interpreting an ambiguity, although in the case of contracts, it is a mutual declaration of intention which is sought to be found. (9 Wigmore, Evidence, *supra,* § 2472, p. 249.) ■ Here, Heston offered the brief to show that both

---

[3]In Farmers' brief before the NLRB the Agreement in issue here was referred to as "the buff agreement," and its predecessor was described as "the yellow agreement." The brief contained the following damaging statements: "The buff agreement carries forth the same provisions for valuing the agent's ownership of his policies as was contained in the yellow agreement, except that they were somewhat liberalized for the agent. . . . [¶] *On the termination of his agency the agent may, if he elects, retain ownership of his policies, refusing payment of 'contract value' and remain in competition with the company for those policyholders.* Quite a number of agents choose to exercise that alternative. [¶] . . . . [¶] The yellow agreement prohibited an agent from competing for three years after termination if he was paid contract value. The buff agreement reduced the period to one year. [¶] . . . . [¶] The yellow agreement prohibited a terminated agent from competing under any circumstances. *Under the buff agreement he may elect on termination to decline contract value and thereby retain the right to compete against Farmers without restriction.* [¶] . . . . [¶] . . . the agent is not obliged to sell his policies to the company but may keep them and compete if he desires. *Therefore, the union's argument that 'contract value' deprives the agent of ownership of his policy is ridiculous;* indeed, an out and out misrepresentation." (Italics added.)

The brief also set forth the testimony of its general counsel, an officer responsible for Farmers' contracts and the performance of same, as to what occurred upon termination, with one option stated as "[t]he agent decides to keep ownership of his policies, refuse Company-offered payment of contract value, and competes with Farmers to retain the patronage of his policyholders after his termination, . . ."

he and Farmers intended the Agreement to mean the same thing. The interpretation offered by Farmers' counsel in the NLRB brief was furthermore consistent with the language used and with a meaning to which the language was reasonably susceptible. (*Moss Dev. Co.* v. *Geary, supra,* 41 Cal.App.3d at p. 12.)

Farmers incredulously insists that the trial court's interpretation that pursuant to the Agreement and the evidence received as to its meaning, Heston could decline contract value, retain ownership of his business and compete with Farmers, is one of which the Agreement is not reasonably susceptible. Given the ambiguity of language and the clarifying aids considered by the trial court, such an interpretation was eminently reasonable.[4]

The trial court committed no abuse of discretion in admitting the material contained in the NLRB brief and the evidence of other disputes over agreements between Farmers and other Farmers' agents. In any event, the ambiguity in the Agreement, coupled with the representations in the Explainer and the oral representations made to Heston, constituted sufficient evidence in and of itself upon which to base the trial court's interpretation, and Farmers' other evidentiary objections are not well taken.

Furthermore, the applicable rule of construction for a form contract of the type here is that any uncertainty is construed against the drafter, the party causing the uncertainty. (*Taylor* v. *J. B. Hill Co.* (1948) 31 Cal.2d 373, 374 [189 P.2d 258]; *Ecco-Phoenix Electric Corp.* v. *Howard J. White, Inc.* (1969) 1 Cal.3d 266, 272 [81 Cal.Rptr. 849, 461 P.2d 33]; *Howe* v. *American Baptist Homes of the West, Inc.* (1980) 112 Cal.App.3d 622, 628 [169 Cal.Rptr. 418]; Civ. Code, § 1654.) In this case, any uncertainty must be construed against Farmers.

Based on the evidence properly admitted, we conclude the trial court's interpretation that Heston had the option of refusing contract value and maintaining his insurance agency intact stands.

### 3. *Trade Secrets Doctrine Inapplicable.*

Farmers is adamant that its right to the manuals, files and policyholder information is absolute—not contingent on contract value payment,

---

[4]We comment on Farmers' lament that "[s]urely Farmers is not bound for all eternity to [the statements made in the 1973 NLRB brief] and forever foreclosed from seeking injunctive relief . . . ." The obvious answer is for Farmers to rid itself of inherently conflicting and ambiguous contracts and to draft ones that will withstand judicial scrutiny. (*State Farm Mut. etc. Ins. Co.* v. *Dempster* (1959) 174 Cal.App.2d 418 [344 P.2d 821].)

and not limited by the one-year provision in paragraph H of the Agreement—because that information constituted *trade secrets*.

The third and controlling sentence thereof declared that ". . . all manuals, lists and records of any kind *(including information pertaining to policyholders and expirations) are the confidential property* of the Companies . . . ." (Italics added.) The agent further "agrees they shall not be used or divulged in any way detrimental to the Compaies and shall be returned to the Companies upon termination of the Agency."

Farmers relied on *State Farm Mut. etc. Ins. Co. v. Dempster, supra,* 174 Cal.App.2d 418, in arguing that Heston should not be entitled to retain the policyholder information he accumulated during the life of his Agreement to sell Farmers' policies.

In *Dempster,* terminated insurance agents had been enjoined by the trial court from interfering with policyholders they had serviced as agents and were required to turn over materials and records in their possession. The appellate court upheld the trial court's injunction, finding that the policyholder information was the equivalent of valuable trade secrets acquired in the course of a confidential relationship with State Farm. (*Id.,* at p. 426.)

The *Dempster* case is distinguishable, however, from the instant case for at least two reasons. First, the express language of the contract there made no mention of a condition precedent of contract payment in order for the covenant to be enforced. Secondly, both the trial and appellate courts in *Dempster* found the contract to be *unambiguous.* (*Id.,* at p. 423.)

No parol evidence was therefore admitted in the *Dempster* case. In the present case, the trial court found the Agreement ambiguous, and properly admitted parol evidence which tended to show that the right to the accumulated policyholder information lay with Heston in the absence of payment of contract value.

4. *Credit Plan Provisions Unavailing to Farmers.*

The trial court summarily dismissed the Credit Plan as not having any impact on the rights of the parties under the Agreement. It held that the "payment" of contract value pursuant to the Credit Plan did not activate the provisions of paragraph H of the Agreement because Farmers did not notify Heston it was making such payment.

Farmers maintained it gave notice, and that by Farmers' making payment to the Credit Union, Heston was thereby estopped from asserting

that Heston had any right to reject the contract value offered him under the Agreement.

However, as noted above, any interpretation of the terms of the Credit Plan depend on the interpretation of the ambiguous terms in the underlying Agreement. The Agreement is mentioned throughout the Credit Plan contract. Contract value is also referred to therein and is allowed as security and defined to include an agent's rights in the Agreement. The two documents are interrelated and must be read together for purposes of interpretation. (*Bell* v. *Rio Grande Oil Co.* (1937) 23 Cal.App.2d 436, 440 [73 P.2d 662]; *Harm* v. *Frasher* (1960) 181 Cal.App.2d 405, 413 [5 Cal.Rptr. 367].)

The pertinent phrase is: "Upon termination of [the] Agreement . . . the Companies are authorized to pay to [the Credit Union] the balance due . . . from any sums *due or to become due* [the agent] under the terms of [the] Agreement." (Italics added.)

Whether the "sums" were due Heston depended, however, on his opting to accept contract value. Under the interpretation of the Agreement as determined by the trial court, no sums would ever become "due" to Heston if he exercised his option to refuse contract value, which he did here.

Since no sums became due an agent unless and until said agent accepted contract value, no "payments" by Farmers to the Credit Union would be authorized by an agent until that acceptance.[5] Therefore, Farmers' utilization of the rights spelled out in this paragraph of the Credit Plan are all *conditioned* on an agent's *accepting* proferred contract value under the Agreement. (Civ. Code, § 1436; *Sosin* v. *Richardson* (1962) 210 Cal.App.2d 258, 264 [26 Cal.Rptr. 610].)

Farmers' attempted reliance on the provisions of the Credit Plan was thus unavailing.

## CONCLUSION

The trial court's denial of Farmers requested injunction, based on its interpretation of Farmers' ambiguous contract to Heston, is affirmed. Parol

---

[5]Heston apparently continued to make regular payments on the loan through his termination date. Had Farmers not repaid the loan, Heston would have been eligible to refinance it. The present posture appears to be that Farmers has rejected Heston's installment check for $2,500 in partial payment of the amount Farmers paid to the Credit Union, presumably seeking to maintain its position that by making the payment, it forced the sale of Heston's agency to Farmers. Heston obviously owes the $5,404.51 to either the Credit Union or Farmers.

evidence was properly received and tended to show that Farmers' rights to enforce the noncompetition provisions and to the policyholder information were contingent on payment of contract value. Such evidence also supported the trial court's interpretation that Heston had the right to refuse contract value. Nor can Farmers assert that the policyholder information and records constituted its trade secrets, because the Agreement itself contradicts such a claim.

Farmers could not rely on the Credit Plan provisions because no balance became due Heston under the Agreement until he accepted contract value, and no payments by Farmers to the Credit Union would be authorized without an acceptance.

## DISPOSITION

The judgment is affirmed.

Lui, J., and Arabian, J., concurred.

A petition for a rehearing was denied October 25, 1984, and appellants' petition for a hearing by the Supreme Court was denied December 12, 1984.