Filed 8/15/23  Marriage of Sparks CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of KIYOMI SPARKS and ADAM SPARKS. | |
| KIYOMI SPARKS,<br><br>　　　　　Respondent,<br><br>　　v.<br><br>ADAM SPARKS,<br><br>　　　　　Appellant. | A163637<br><br>(Contra Costa County<br>Super. Ct. No. D1506010) |

Adam Sparks and Kiyomi Sparks agreed in their Marital Settlement Agreement (MSA) that they would "equally share in any recovery in connection with" third party actions against them pending at the time of the dissolution of their marriage.  Several months later, those actions settled for $15.8 million, after which Kiyomi[1] requested orders to enforce the MSA and award her a share of the settlement proceeds, plus attorney fees.  In a comprehensive, 12-page statement of decision, the trial court granted

---

[1] As is customary in family law cases, we refer to the parties by their first names for purposes of clarity.

Kiyomi's requests, awarding her $2.05 million from the settlement proceeds and attorney fees, and entered judgment. Adam appeals, contending the trial court misinterpreted the settlement agreement in the third party actions. We reject his contentions, and we affirm.

## BACKGROUND

### The Parties and their Properties

Adam and Kiyomi were married on October 10, 1986. They separated on July 2, 2015. And on December 21 of that year, Kiyomi petitioned to dissolve their marriage.

During their 29-year marriage, Adam and Kiyomi owned and operated Pacific Bay Investments, Inc. (PBI), a corporation that provided services in real property management and asset development. In January 2000, they created the Adam Sparks Family Revocable Trust ("Sparks Family Trust"), with themselves as co-trustees. Title to PBI was held by the trust.

Also during their marriage, Adam and Kiyomi acquired a large number of real estate holdings. Some of these properties were owned by the parties under various entities (limited liability companies, limited partnerships, corporations, or trusts), while other properties were owned in partnership with third party individuals or entities. PBI oversaw approximately 35 to 40 property interests at any given time.

In 2000, the Sparks Family Trust and Giampaolo Boschetti entered into a partnership that primarily consisted of jointly purchasing real property. Ownership of these properties was divided between the Sparks (or their trust or entities), and Boschetti (or his entities), so that each owned a share of the properties.

### The *Boschetti* Actions

Disputes with Boschetti concerning certain properties arose, resulting

2

in Boschetti filing three lawsuits: first in 2009 in San Francisco Superior Court; next in 2018 in San Francisco Superior Court; and after that, in 2019 in a Hawaii state court (collectively, the "*Boschetti* actions" or "*Boschetti* litigation"). The record indicates Boschetti sued Adam individually, Adam and Kiyomi as co-trustees of the Sparks Family Trust, the Sparks Family Trust, PBI, and other entities owned by the parties; Kiyomi was not sued in her individual capacity. It also appears Boschetti asserted a number of claims related to the management of certain properties, including violation of the Business and Professions Code and breach of the implied covenant of good faith and fair dealing. He also sought declaratory relief, an injunction, an accounting, and the production of business records.

Adam and Kiyomi agreed to be jointly represented in the *Boschetti* actions by Jeffrey Makoff of Valle Makoff LLP.

At some point, Adam, individually and on behalf of the Sparks Family Trust, and PBI filed a cross-complaint against Boschetti. The operative fourth-amended cross-complaint alleges causes of action for fraud, conversion, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, breach of contract, accounting, seizure of corporate opportunity, quantum meruit, dissolution of partnership, and declaratory relief (collectively, "counterclaims").

**The MSA and the Judgment of Dissolution**

In April 2019, while the *Boschetti* actions were pending, Adam and Kiyomi entered into the MSA.

Under Article 4 of the MSA, the parties agreed to divide 39 properties in which they both had an interest.[2] Sixteen of the properties were identified

---

[2] The MSA lists the properties with associated numbers 1 through 38. Two related properties (Meadow Creek and Woodlake Village Shopping

3

as "fractionally" owned, meaning that the properties were owned in partnership with at least one other third party. The MSA noted that the market values of those properties were discounted by 20 percent due to them being fractionally owned.[3] Of those fractionally owned properties subject to the 20 percent discount, 11 were involved in the *Boschetti* actions (collectively, the "subject properties"). Applying the 20-percent discount to the subject properties resulted in their net worth totaling $11.7 million.

Under paragraph (d) of Article 4, the parties agreed that Adam would retain 34 of those properties as his sole and separate property, 11 of which were the subject properties. The total net worth of the properties awarded to Adam was over $28.9 million.

Under paragraph (e) of Article 4, Kiyomi retained the remaining five properties, with a total net worth of over $32.7 million.

Article 6 provided that Kiyomi and Adam would own the business interests associated with the properties with which they were awarded under Article 4.

The valuations of the properties in the MSA were based on Adam's own

---

Centers) are identified as numbers 36a and 36b, respectively. Throughout the proceedings, these properties sometimes were referred to as a single property, thus resulting in a total of 38 properties. Other times, they were referred to as two separate properties, thus resulting in a total of 39 properties. In addition, Exhibit 1 to the MSA lists the properties as numbered 1 through 37 because it mistakenly omits a reference number between 31 and 32 for the College Park Shopping Center. But in the body of the MSA this property is correctly labeled number 32, and the properties listed afterwards are correctly numbered 33 through 38.

[3] As would later be explained at trial, the reasoning behind the discounted value is that property that is only partially owned is less attractive to a purchaser and harder to sell because the purchaser would essentially be agreeing to buy property, he or she would not be able to unilaterally sell or alter.

4

estimations; the parties did not obtain an independent appraisal.

As significant here, Article 15 provides: "The parties acknowledge and agree they are both defendants in an active lawsuit filed by a Giampaolo Boschetti in 2009 in San Francisco Superior Court . . . . The parties further acknowledge and agree that since commencement of the action, the parties have been represented by Jeffrey Makoff, Esq. and have jointly shared in the defense of the action. The parties further agree to maintain the status quo by continuing to jointly defend against the lawsuit equally dividing any costs. The parties agree that each party is jointly and severally liable for any and all liability found by the Court and equally share in any recovery in connection with [the *Boschetti* actions]."

Article 41 states: "The parties hereby agree that in any subsequent proceeding in this action for marital dissolution, extrinsic evidence shall not be admissible to prove the parties' intentions concerning ambiguous language in this Agreement."

Finally, Articles 37 and 39 provide that the prevailing party in any action for breach of the MSA would be entitled to an award of attorney fees.

The MSA was incorporated into a stipulated judgment of dissolution, which judgment was entered on June 25, 2019.

**The Settlement of the *Boschetti* Actions**

On January 15, 2020, Adam, Kiyomi, and Boschetti entered into the "Settlement Agreement and Mutual General Release" ("BSA"). The BSA identified January 15, 2020 as the date it took effect, as well "the execution date." The final paragraph of BSA states that "the parties have caused this Agreement to be executed as of the date and year first written above" and

follows with the parties' signatures.[4]

Paragraph 2 of the BSA provides in pertinent part:  "**Release Except for Rights and Obligations Hereunder**. . . .  for and in consideration of purchase and sale of the interests in the Properties provided herein, and for the payments set forth herein, and in exchange and consideration for the covenants contained herein, and for other good and valuable consideration . . . , each of the Parties . . . hereby release[] and forever discharge[] each other Party . . . from any and all claims . . . and causes of action . . . of every nature, character, and description . . . . including but not limited to . . . all claims alleged in the Actions."  "Actions" referred to the three *Boschetti* actions.  And "Properties" was defined to include the subject properties.

Paragraph 5 provides:  "**Purchase of All Interests by Boschetti and Sale Of All Interests To Him**.  Boschetti agrees to buy, and Sparks . . . agree to sell, Sparks'[s] . . . . entire right, title and interest in the Properties . . . to Boschetti so that Boschetti . . . . shall be 100% owner in fee of each of the Properties . . . . , for the net prices to be paid set forth in the attached Exhibit A.  The total aggregate price for all of Selling Parties' interests in the Properties is . . . $15,800,000."  Exhibit A to the BSA lists and sets forth the prices of each property to be purchased.

**Post-Judgment Requests for Orders**

On June 19, 2020, Adam filed a request for orders (RFO) to enforce Articles 4 and 15 the MSA, arguing that Kiyomi failed to transfer to him title

_____

[4] At trial, Kiyomi did not recall exactly when she signed the BSA, though she believed she did so between January 15 and January 20.  Adam recalled signing the BSA around the same time that he sent her a letter on January 14 demanding she sign a deed of trust regarding certain property.

6

of the properties awarded to him under the MSA and refused to pay her share of attorney Makoff's fees incurred in the *Boschetti* actions (then over $100,000). Adam also sought attorney fees for bringing the RFO.

Kiyomi filed her responsive declaration, in which she argued she was entitled under Article 15 of the MSA to receive, but had not received, her share of the "recovery" from the settlement proceeds in the *Boschetti* actions. She also disputed Adam's fee request on the grounds that their joint attorney excluded her from communications regarding the settlement. Kiyomi stated, "I am willing to pay Mr. Makoff's fees and costs when I receive my entitled share of the *Boschetti* Matter recovery." Adam filed a reply.

On July 9, Kiyomi filed her own RFO seeking to enforce Article 15 of the MSA, specifically arguing she was entitled to half of the $15.8 million settlement sum in the *Boschetti* actions, or $7.9 million. Kiyomi additionally sought attorney fees pursuant to Article 37 of the MSA.

### Pre-Trial Proceedings

On July 23, the trial court held a hearing on the RFOs, during which Adam's attorney argued that Kiyomi "has come up with this new argument trying to bring in extrinsic evidence of the fee agreement, and all we're seeking today is enforcement of the Article 15 of our MSA . . . . The execution and enforcement of the civil case is not before the court. It's not in the court's jurisdiction . . . ." Counsel argued there was no need for an evidentiary hearing on the RFOs. The court consolidated the parties' RFOs, ordered the parties to attend mediation, and set the RFOs for trial on October 15 and 16 in the event the issues were not resolved at mediation.

Adam sought "reconsideration" of the order setting trial dates, again arguing "[t]here is no need for an evidentiary hearing" with respect to Kiyomi's RFO. Adam cited Article 41 of the MSA prohibiting the use of

7

extrinsic evidence to explain any ambiguity in the MSA. He also argued, "the Boschetti agreement is not before the Court in this family law matter" and "all that is at issue is the MSA itself." Kiyomi opposed the request.

On September 21, Adam filed a "motion in limine to exclude extrinsic evidence offered to prove the meaning of Article 15 of the MSA . . . ." Adam based his motion mainly on Article 41 of the MSA.

Kiyomi opposed the motion, arguing "[t]here are clearly competing interpretations of the MSA as it relates to 'recovery' in the *Boschetti* Matter, as [she] has one interpretation such that she is entitled to half of the $15M recovery, and . . . Adam is claiming that there should be no recovery. As the language used is fairly susceptible to two interpretations, extrinsic evidence and parol evidence must be used to aid the Court." Kiyomi specified that extrinsic evidence regarding the "substance and outcome" and "settlement of the *Boschetti* Matter" should be considered.

In early December, the parties filed their trial briefs. Adam intended to call one expert witness: an attorney who had been retained in the *Boschetti* actions "to review and analyze documents to summarize the voluminous pleadings filed in the [actions]," and who would "offer testimony on the [BSA]."

Kiyomi's witness list included herself, Adam, experts, and other witnesses, including Marie Ebersbacher, C.P.A., the parties' financial expert in the *Boschetti* actions who would testify as to the value of the parties' counterclaims.

Adam filed another motion in limine to exclude, primarily on relevance grounds, the testimony of Kiyomi's witnesses. Kiyomi opposed the motion, and Adam replied.

On April 8, 2021, after holding a hearing, the court granted Adam's

8

motion in limine to exclude extrinsic evidence to interpret the language of Article 15 of the MSA. However, it permitted the parties to introduce "evidence related to whether there was 'any recovery' in connection with the settlement of the *Boschetti* civil cases."

### *The Trial*

The court held a bench trial over four days in May 2021.

During trial, Kiyomi asserted various theories as to her "recovery" from the settlement of the *Boschetti* actions within the meaning of Article 15 of the MSA. Her principal theory was that she was entitled to half of the entirety of the $15.8 million settlement sum, or $7.9 million. Kiyomi also raised alternative theories, one of which was that the "recovery" was the "differential between the price of the properties in the MSA [$11.7 million] and the price of the properties sold to Adam in the settlement agreement [$15.8 million]"—or $4.1 million. Under this theory, she was entitled to one-half of this amount, or $2.05 million.

In contrast, Adam's theory was that the BSA provided for no "recovery" because the properties that were sold to Boschetti under the BSA were his sole and separate property and, as such, he had sole control and ownership of it, as well as any proceeds derived from such ownership.

Witnesses who testified included Kiyomi, accountant Marie Ebersbacher, and Adam. The court also received documentary evidence. The evidence at trial showed the following.

After proceeding for 11 years, the *Boschetti* actions were set to go to trial in January 2020. Two months before that, Adam and Boschetti began settlement discussions.

On December 6, 2019, Adam emailed Makoff, copying Kiyomi, discussing the parties' counterclaims and a framework for a global

settlement.  Adam wrote, "The strength of our counterclaim[s] would determine our willingness to settle."  He stated that although he wished to further discuss the "strength" of the counterclaims with Makoff, "[he] th[ought] they're reasonable and [they] should proceed with them."  Adam then stated, "I would fold my claims into the property division.  For example, if my claim if [*sic*] for a total of $6MM, I would accept a property trade whereby I get $3MM more in equity than what I had just proposed."

When asked to explain this email, Adam testified that "it was reasonable to proceed in that way as if [the counterclaims] were fair.  It was a negotiating posture."  Adam further testified that Makoff replied to his email, stating, " 'We should signal that we're confident of those claims.' "  "In other words," Adam said, "regardless of how weak [the counterclaims] are, we should pretend they are great.  That is what [Makoff] was saying."

Kiyomi and Adam each testified as to their understanding of the strength of the counterclaims.  Kiyomi was advised that they were "strong," while Adam maintained they were "very weak."

Marie Ebersbacher, an accountant whom the parties had retained as an economic expert in the *Boschetti* actions, testified she was asked to prepare a summary of damages for the parties' counterclaims for purposes of the settlement conference.  By her calculations, the damages for the counterclaims amounted to $9.8 million, not inclusive of damages for the parties' additional claims related to option properties and special services.

A settlement conference took place "right before Christmas" of 2019.  Adam, Makoff, and Boschetti were present; Kiyomi was not.  Adam testified that he and Boschetti ultimately reached a settlement agreement whereby Boschetti would purchase the subject properties for $15.8 million.

Adam was asked why there was a difference between the purchase

10

price of the properties ($15.8 million) and the values of the properties as assigned in the MSA ($11.7 million). Adam testified that the $11.7 million valuation in the MSA reflected the net value of the properties, discounted by 20 percent due to them being under "fractional" ownership at the time. By virtue of the sale of the properties to Boschetti under the BSA, Adam testified, Boschetti would become the sole owner of the properties, the properties thus would no longer be "fractionally" owned, and consequently the 20 percent discount due to fractional ownership would no longer be applicable. Without the discount, Adam asserted, the value of the properties was $16.7 million. Adam further testified that he agreed to give Boschetti a $1 million discount on the $16.7 million, because Boschetti agreed to purchase the subject properties at all once—hence, the total purchase price of $15.8 million.

Despite Adam's testimony that the purchase price was based on the properties' market value, Adam confirmed that no independent appraisal of the properties had been performed.

Also, it was not entirely clear as to how the $15.8 million settlement amount originated. As mentioned above, Adam testified that he initially proposed the $16.7 million price based on what he claimed was the market value of the properties. Other times, however, he testified that "[t]he numbers came out to 15.8 million because that is the buyout price Mr. Boschetti offered me in the settlement agreement, and what I think [Adam's attorneys] did is they tried to allocate each property of value that would total up to 15.8 million." He said, "The numbers that were associated with each property were essentially allocated to match up with the $15.8 million number."

Kiyomi testified that after the settlement conference, she was not

11

included on some of the correspondence between Adam and Makoff regarding the BSA. She stated she received "many different version[s]" of the BSA, but that "many times was just a signature page" without the full document or the exhibits referenced in the document. Kiyomi reminded Makoff to include her in all correspondence.[5]

Kiyomi signed the BSA with the expectation that she had an "equal recovery right" with respect to the settlement proceeds.

On January 16, 2020, the day after the parties executed the BSA, Makoff circulated a copy of a proposed "Amendment to Marital Settlement Agreement." As pertinent here, Paragraph 3 of that document states: "Neither Adam nor Kiyomi shall claim any adjustment, positive or negative, to the property division in the MSA as a result of the [Boschetti] Settlement. Any gain or loss on the sale of any property . . . in the performance of the Settlement shall accrue to Adam (and not Kiyomi). Adam and Kiyomi agree that there will be no net recovery or liability to divide between them as a result of the terms of Settlement of the Boschetti Litigation." In addition, Paragraph 5 states, "This Amendment . . . expressly supersedes Article 15 of the MSA."

Adam testified he provided input on the language of the proposed

---

[5] At this time Kiyomi also had a family law attorney, Andrew Ross. According to Kiyomi, Ross was ill and hospitalized for approximately the month of December 2019. Because of his illness, along with the fact he was merely her personal family law attorney and not counsel of record in the *Boschetti* actions, any involvement he may have had on her behalf in the settlement of those actions was limited. Kiyomi further testified as to her belief that Ross did not have a hand in drafting the BSA. Complaining that Makoff was "supposed to be" her and Adam's joint counsel in the *Boschetti* actions, Kiyomi at some point filed a legal malpractice lawsuit against Makoff and his firm.

amendment and later approved the final draft. Kiyomi, on the other hand, refused to sign it, understanding it would have the effect of divesting her of her "equal share of recovery" from the BSA settlement proceeds. She testified, "I think [Adam] believed I have a right; therefore, he wants me to give up my right. . . . That doesn't make sense why I would sign such agreement."

Following the presentation of the evidence, the parties submitted their closing arguments in writing.

### The Trial Court's Decision

On July 21, 2021, the court issued a tentative statement of decision awarding Kiyomi $2.05 million—one-half of $4.1 million, the difference between the value of the subject properties as assigned under the MSA ($11.7 million) and the settlement sum under the BSA ($15.8 million)—and attorney fees.

Adam objected to the tentative decision on various substantive grounds. Kiyomi submitted her response to Adam's objections, after which the court issued its final statement of decision adopting the tentative decision.

The court rejected Kiyomi's theory that she was entitled to half of the entirety of the $15.8 million settlement sum, finding that such a result would run afoul of Article 4 of the MSA. Nonetheless, it determined Kiyomi was "still . . . entitled to some share" of the settlement proceeds. The court explained:

"While Adam is correct that the property that was subject to the Boschetti sale was awarded to him under the terms of the MSA and, as his separate property, should be his to dispose of as he wished, his argument to retain all of the proceeds overlooks the fact that the evidence established that

13

the Boschetti Litigation settlement also resolved the claims the Sparks and their entities pursed related to *community property* interests. These claims alleged that the Sparks and their entities provided Boschetti with property management services and that he owed the Sparks and their entities management fees, commissions and 'equity bonuses,' all of which became due from Boschetti *during the marriage. . . .* These community property claims were also released as part of the Boschetti Litigation settlement."

The court continued: "So the question becomes whether something of value to the community was obtained from the settlement—i.e., whether the community effectively received a 'recovery' of some kind from the settlement agreement and mutual release of all claims." The court answered yes, concluding "the preponderance of the evidence supports a finding that the amount received from Boschetti in the settlement over and above the $11.7 million worth of property as valued approximately eight months earlier is a 'recovery' of a community asset in the amount of $4.1 million for the purposes of Article 15 and is to be equally shared between Adam and Kiyomi." (Fn. omitted.) The court stated several reasons for its conclusion, including the following:

"First, and most significantly, Adam's own statements to counsel and Kiyomi discussing the 'strength of our counterclaim' and the framework for a global settlement of the Boschetti Litigation, proposed the concept of 'fold[ing] my claims into the property division' to get a 'property trade' millions of dollars 'more in equity.' In other words, he acknowledged seeking a settlement that would be more than just the value of the real property to account for settling the counterclaims. He conceded that there is 'added value' to the case over and above the value of the property to be sold to Boschetti. . . . Kiyomi not so subtly intimates that Adam and Makoff may

have actually plotted to structure any resolution with Boschetti so as to avoid any claim that a 'recovery' was obtained. The evidence does not support such a nefarious scheme, although the proposed (and rejected) amendment to the MSA discussed next lends support to this suspicion.

"Second, just prior to the execution of the Boschetti Litigation, Makoff circulated a proposed amendment to the MSA that stated that Kiyomi gives up any claim to any gain arising from the sale of the properties in the Boschetti Agreement. . . . Kiyomi refused to sign.

"Third, there was no evidence presented to support an 'independent' basis for the properties to have increased in value by $4.1 million in the eight months since execution of the MSA. Furthermore, there was no substantial evidence of other facts besides the resolution of the counterclaims that supported the difference between the recently-valued property and the settlement sum. . . .

"Fourth, albeit a less persuasive basis for finding a $4.1 million recovery, there was a 'carve-out' in the settlement agreement anticipating the possibility of a 'recovery.' Section 2 of the Boschetti Litigation Settlement set forth mutual releases of all claims by all parties and entities, known or unknown, but specifically stated that 'Nothing herein shall be construed to release or compromise claims between or among' Adam Sparks (in any capacity), Kiyomi Sparks (in any capacity), or their Trusts, or business interests in which Boschetti has no financial interest 'nor shall this Agreement affect the rights and obligations of Adam Sparks and Kiyomi Sparks under the [MSA] (and judgment thereon) or any amendment thereof and all claims thereunder are preserved.' While Section 2 standing alone would not be determinative of the issue here . . . , viewed in the context of the other factors cited above, Section 2 is consistent with the concept of a

15

potential 'recovery' arising from the Boschetti Litigation."

The court added, "Adam further claims that he 'lost money' in the transaction because the subject properties were actually worth $16.7 million. This is faulty reasoning. Adam placed the $11.7 million valuation on the real property for the purpose of property division. He derived the benefit of that property valuation in the division of the community property and cannot now claim it was really worth more for the purposes of Article 15 analysis. Also, Adam's theory would mean he agreed to receive over a million dollars less from Boschetti than what he claims as the fair market value of the properties *and* agreed to give up all the 'strong' and substantial counterclaims against Boschetti—an unlikely scenario for such a successful and savvy entrepreneur."

Accordingly, the court found Kiyomi was entitled to one-half of $4.1 million, or $2.05 million, of the settlement proceeds under the BSA. Based on this, the court found Kiyomi was the prevailing party with respect to her claim to enforce Article 15 of the MSA and thus awarded her $93,361.35 in fees and costs pursuant to Article 37.

The court separately granted Adam's RFO to compel Kiyomi to pay her share of Makoff's fees and costs in the amount of $79,323.63.

On September 16, the "judgment on post-judgment enforcement issues" was entered.

This appeal followed.

## DISCUSSION

### Introduction

This case involves the interplay between two separate contracts: the MSA and the BSA. As Kiyomi frames it, "[t]he key question is whether the BSA provides 'any recovery in connection with' the [*Boschetti*] Actions under

16

Article 15 of the MSA. . . ." This question, which presents an issue of contract interpretation, was resolved by the trial court in favor of Kiyomi.

Adam argues the court "erroneously construed the BSA contrary to its unambiguous language in holding that the $15.8 million purchase of [his] real estate included an unstated $4.1 million 'recovery' on litigation counterclaims"; "the parol evidence rule barr[ed] [the court from] using extrinsic evidence to find a $4.1 million 'recovery' in the Boschetti settlement"; and none of the reasons stated in the statement of decision supports a finding of a $4.1 million "recovery." Adam further contends that because the award of $2.05 million requires reversal, we must also reverse the attorney fee award.

We reject these contentions. As we shall explain, the BSA is ambiguous, i.e., reasonably susceptible to the parties' competing interpretations, and extrinsic evidence was properly admitted to interpret the ambiguity. We further conclude substantial evidence supports the trial court's determination that the parties intended the BSA to include a "recovery" attributable to the parties' counterclaims within the meaning of Article 15 of the MSA. Because we affirm the court's decision to grant Kiyomi's RFO, we also affirm the fee award.

We now set forth the applicable legal principles.

**Principles of Contract Interpretation and Standards of Review**

Settlement agreements, including marital settlement agreements incorporated into a dissolution judgment, are construed under the same rules that apply to any other contract. (*In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 47; *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439.) In interpreting a contract, the trial court must "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) When parties

17

settle an agreement in writing, their intent "is to be ascertained from the writing alone, if possible . . . ." (*Id.*, § 1639.)

"The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. [Citations.] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. [Citations.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126, citing *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37 (*Pacific Gas*).)

In such cases, the court engages in a two-step process: "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]" (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

As for how such determinations are reviewed on appeal, whether an ambiguity exists is a question of law, subject to independent review. (*Winet, supra,* 4 Cal.App.4th at p. 1165.) The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. (*Ibid.*) However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact that will be upheld so long as substantial evidence supports it. (*Ibid.*; see *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC* (2020) 53 Cal.App.5th 807, 819, quoting *City of Hope National Medical*

18

*Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 (*City of Hope*) ["
'[W]hen . . . ascertaining the intent of the parties at the time the contract was
executed depends on the credibility of extrinsic evidence, that credibility
determination and the interpretation of the contract are questions of
fact . . .' "].)

### Kiyomi Proved She Was Entitled To a Share of the Settlement Proceeds From the *Boschetti* Actions

#### *The MSA*

We start with the overarching provision at issue in this case, Article 15
of the MSA, which states in relevant part: "The parties agree that each party
is jointly and severally liable for any and all liability found by the Court and
*equally share in any recovery* in connection with [the *Boschetti* litigation]."
(Italics added.)

At trial, the parties disputed the meaning of the phrase "any recovery."
Kiyomi argued that "recovery" is not limited to situations where a court has
entered judgment for a party but includes settlements prior to a trial. Adam,
on the other hand, argued that "recovery" refers only to an award by a
judgment or decree. The trial court rejected Adam's interpretation,
explaining there was no language in Article 15 that limited the word
"recovery" to only a judgment or award after trial. Rather, the court found,
"The only rational implication to be derived from the language in Article 15 is
that the parties would equally share any of the burdens as well as any of the
benefits of the Boschetti Litigation, whatever the source."

The court further found that "recovery" as it related to the *Boschetti*
actions referred to the benefits, if any, that were realized from the parties'
counterclaims against Boschetti. The court characterized those
counterclaims as belonging to the community and concluded that "to the
extent the claims could become realized, they remained as community

property assets." As a result, the court concluded that under Article 15, each party was entitled to a one-half interest in the "community" share of the proceeds, if any, from the settlement of the *Boschetti* actions.

On appeal, Adam does not address, much less dispute, the court's interpretation of Article 15 of the MSA. Because a trial court's decision is presumed to be correct, and Adam as the appellant has failed to demonstrate any error, we will uphold the court's interpretation of Article 15 of the MSA. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)

We move on to "whether the community effectively received a 'recovery' of some kind from the settlement agreement and mutual release of all claims" under the BSA.

### *The BSA*

At trial, Kiyomi argued various theories as to what constituted a "recovery" from the settlement of the *Boschetti* actions. At issue here is the one adopted by the trial court: that Kiyomi was "entitled to half of the difference of $4.1 million of profit realized by Adam above and beyond the value of the property as assessed for purposes of the property division recognized in the MSA," or $2.05 million.[6]

---

[6] Kiyomi's initial and principal argument was that she was entitled to half of the entirety of settlement proceeds of $15.8 million. The trial court rejected that theory of recovery but found she was nonetheless entitled to a portion of the proceeds. In her respondent's brief, Kiyomi states that although she could have filed a cross-appeal from the aspect of the court's decision declining to award her half of the $15.8 million settlement, she elected not to do so, conceding that "[r]ecovery of half would arguably be inconsistent with the implementation of the MSA by which Adam received those properties which he alone valued at $11.7 million." Because Kiyomi has not filed a cross-appeal, any argument that she was entitled to half of the $15.8 million settlement sum is not reviewable. (See *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1121 ["respondents

20

In challenging that determination, Adam raises three main arguments: (1) the court construed the BSA contrary to its unambiguous language; (2) the court improperly admitted extrinsic evidence; and (3) neither the evidence nor any of the reasons stated in the statement of decision supports the court's interpretation of the BSA.

### Adam Is Precluded from Challenging the Admission of Extrinsic Evidence

At the threshold, Kiyomi argues that Adam forfeited his challenge to the admission of extrinsic evidence because he did not object to its introduction in the trial court. We agree.

Adam filed a motion in limine seeking to exclude any extrinsic evidence to interpret the MSA, but did not raise any similar objections with respect to the BSA. In fact, Adam took the position that "[a]ll that [wa]s at issue is the MSA itself," the BSA had "no impact on the MSA," and the BSA's execution was not "in the court's jurisdiction." Adam also did not object to the court's tentative statement of decision, in which it relied on extrinsic evidence presented at trial, on the grounds the evidence was improperly admitted.[7]

who fail to file a cross-appeal cannot claim error in connection with the opposing party's appeal"].)

[7] In his reply brief, Adam contends he raised objections to extrinsic evidence related to both the MSA and the BSA. However, the portions of the record he cites disclose that his counsel raised only general assertions that both documents "speak for themselves." Counsel's comments do not satisfy the rule that an objection to the introduction of evidence must "make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a); *People v. Williams* (1988) 44 Cal.3d 883, 906 [A trial objection must be sufficiently specific to encompass the issue raised on appeal].) Further, it appears counsel's comments were made within the context of an objection to the testimony of one of Kiyomi's expert witnesses on the grounds that the testimony exceeded the scope of testimony described in Kiyomi's witness designation.

Accordingly, Adam may not complain on appeal about the trial court's admission of the extrinsic evidence because he did not object to its introduction at trial. (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23–24.)

Adam is also precluded from challenging the admission of the evidence under the invited error doctrine. In his trial brief, Adam designated an expert to testify as to the various pleadings filed in the *Boschetti* actions. Also, the parties' joint trial brief, under "Respondent's Position," states that "should the Court find that a 'recovery may be within the Civil Settlement Agreement, then a 'recovery' must be shown through submitting evidence of [certain specified topics]." Furthermore, in his opening brief, Adam points out that at trial he sought, unsuccessfully, to introduce evidence related to the circumstances under which the proposed amendment to the MSA was drafted. Having attempted to elicit the evidence himself, Adam is "hardly in a position to object to its admission." (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 38–39; *People v. Williams*, *supra*, 44 Cal.3d at p. 912 ["It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto"].) Any error in the trial court in considering extrinsic evidence was invited by Adam.

Thus, Adam may not challenge the admission of extrinsic evidence to construe the BSA.[8] In any event, for the reasons now explained, we conclude the court did not err in admitting the extrinsic evidence.

### The BSA Is Reasonably Susceptible To Kiyomi's Interpretation

" 'When a dispute arises over the meaning of contract language, the

---

[8] Adam, however, may challenge, as he does, the sufficiency of the evidence to support the judgment. (See *Tahoe National Bank v. Phillips*, *supra*, 4 Cal.3d at pp. 23–24.) We address those challenges below.

first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by [Kiyomi]. If it is not, the case is over.' " (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 393, quoting *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 (*Southern Cal. Edison*).) "Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself [citation] or from extrinsic evidence of the parties' intent [citation]." (*Southern Cal. Edison, supra*, 37 Cal.App.4th at p. 848.)

The trial court did not expressly state whether the BSA was ambiguous. However, it heard Kiyomi's arguments that the BSA was reasonably susceptible to more than one interpretation and that extrinsic evidence was permissible to aid in interpreting the BSA. We may infer from its receipt of extrinsic evidence that it agreed with Kiyomi and considered the BSA ambiguous. And we review that implied finding independently. (*Winet, supra,* 4 Cal.App.4th at p. 1165.)

### *The Contract Language*

We begin with the language of the BSA. Paragraph 2 states in relevant part: "for and in consideration of purchase and sale of the interests in the Properties provided herein, and for the payments set forth herein, and in exchange and consideration for the covenants contained herein, and for other good and valuable consideration . . . , each of the Parties . . . hereby release and forever discharge each other Party . . . from any and all claims . . . and causes of action, of every nature, character, and description . . . . including but not limited to . . . all claims alleged in the Actions." Paragraph 2 also states: "Additionally, Sparks, Pacific Bay and their directors, officers, owners, agents . . . hereby release any and all claims for fees, management fees, asset management fees, commissions or other compensation," which are

23

the claims asserted in the parties' cross-complaint.

Paragraph 5 provides: "Boschetti agrees to buy, and Sparks . . . agree to sell, Sparks' . . . . entire right, title and interest in the Properties . . . to Boschetti so that Boschetti . . . . shall be 100% owner in fee of each of the Properties . . . . , for the net prices to be paid set forth in the attached Exhibit A. The total aggregate price for all of Selling Parties' interests in the Properties is . . . $15,800,000." Exhibit A to the BSA lists and itemizes the values of each property to be purchased.

According to Adam, "Nowhere in paragraph 2, or anywhere else in the BSA, does Boschetti agree to pay Adam *any* amount of money for the release of [the] counterclaims, much less $4.1 million." He also points out that Paragraph 2 does not "contain any reference to the $15.8 million figure or suggest that the payment is related to the release of claims." Adam goes on, "To the contrary, paragraph 5 makes unmistakably clear that the $15.8 million payment is for the purchase of Adam's real estate, and that alone." Finally, Adam relies on Exhibit A's itemization of prices for the individual properties. As such, Adam concludes that the BSA "is only reasonably susceptible of one meaning": his proposed interpretation. We disagree.

In our view, the BSA as a whole is susceptible to more than one interpretation. Adam is correct that the release in Paragraph 2 does not mention the settlement amount or the purchase price of the subject properties, much less apportion the settlement sum. He is also correct that Paragraph 5 and Exhibit A to the BSA provide that $15.8 million is the purchase price of the properties and do not refer back to the release of claims. However, we do not believe these omissions render untenable Kiyomi's interpretation that the $15.8 million settlement sum includes payment for

24

the release of claims.

Adam's quotation to Paragraph 2 in his brief conveniently omits the part where it states: "[*F*]*or and in consideration of purchase and sale of the interests in the Properties provided herein*, and for the payments set forth herein, and in exchange and consideration for the covenants contained herein, and for other good and valuable consideration, receipt of which is hereby acknowledged, *each of the Parties . . . hereby releases and forever discharges each other Party . . . .* from any and all claims . . . ." (Italics added.) This language undermines Adam's assertion that the purchase of the properties under the contract is not "related to the release of claims." To the contrary, Paragraph 2 provides that the two are related—it states that Boschetti was to purchase the properties as consideration for the release of disputed claims. And when Paragraph 2 is read together with Paragraph 5 (the provision setting forth the $15.8 million purchase price for the properties), it is plausible to interpret that amount as encompassing payment for the release of the parties' counterclaims. Thus, we disagree with Adam that the BSA unambiguously memorializes a standalone real estate transaction, and nothing more.

Nor are we persuaded by Adam's arguments that "[t]he BSA's preamble and structure show that the parties considered the property sale and the disposition of the litigation as separate and distinct issues," as well as "support the conclusion that the $15.8 million is payment for property alone and does not include damages for [the] counterclaims." The preamble states the purposes of the BSA, including the parties' "desire to settle, resolve, compromise all of their Disputes and Claims as provided herein, and as part of this Agreement, to have Boschetti purchase the interests owned by the parties in the . . . properties, to provide for the terms of such purchases and

25

sales . . . ." But nothing in the preamble, logically or syntactically, supports Adam's assertion that "the 15.8 million is payment for property alone." Nor does the "structure" of the BSA shed any light on whether, let alone support that, the BSA should be read in the manner Adam proposes. Indeed, Paragraph 2, as discussed above, belies his construction.

Accordingly, the language of the BSA is reasonably susceptible to Kiyomi's interpretation that the $15.8 million includes a payment for release of the counterclaims.

### *Extrinsic Evidence*

Our provisional consideration of the extrinsic evidence confirms what we have just concluded: the BSA is ambiguous.

Before we discuss the evidence, we make one preliminary observation: The fact that the BSA contains integration clauses[9] does not preclude the receipt of extrinsic evidence on the question of ambiguity, contrary to Adam's assertions otherwise. "[E]ven in an integrated contract, extrinsic evidence can be admitted to explain the meaning of the contractual language at issue, although it cannot be used to contradict it or offer an inconsistent meaning. The language, in such a case, must be ' "reasonably susceptible" ' to the proposed meaning." (*Hot Rods, LLC v. Northrop Grumman Systems Corp.* (2015) 242 Cal.App.4th 1166, 1175–1176; accord, *Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1354–1355.)

---

[9] Adam cites Paragraph 22, which states: "Each party acknowledges that this Agreement effects the full, final, and complete settlement of all claims by all Parties against each other . . . ." He also cites Paragraph 28: "This is the entire agreement between the Parties with respect to the subject matter of this Agreement, and it supersedes any and all prior agreements, negotiations, or undertaking among the Parties . . . ." Kiyomi appears to concede the BSA is fully integrated.

26

If we determine the BSA is susceptible to Kiyomi's interpretation, there is no violation of its integration clauses because there is no alteration of its terms. (See, e.g., *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 897–898.)

We turn to the evidence, beginning with the circumstances surrounding the making of the agreement. (See Civ. Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"].) Relevant circumstances to consider include "the object, nature and subject matter of the writing [citations], and the preliminary negotiations between the parties," so that the court "can place itself in the same situation in which the parties found themselves at the time of contracting." (*Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 761 (*Universal Sales*); accord, *Pacific Gas*, *supra*, 69 Cal.2d at p. 40; *Winet*, *supra*, 4 Cal.App.4th at p. 1168.)

Here, Kiyomi introduced testimony and documentary evidence of Adam's and attorney Makoff's negotiation strategy going into the settlement discussions with Boschetti. On December 6, 2019, weeks before the settlement conference, Adam emailed Makoff discussing the "strength of our counterclaim[s]" and a framework for a global settlement. Adam also proposed the concept of "fold[ing]" the counterclaims "into the property division" to get a "property trade" millions of dollars "more in equity." When asked about this email, Adam testified, "it was reasonable to proceed in that way as if [the counterclaims] were fair. It was a negotiating posture." Adam also testified that Makoff apparently agreed with this negotiating strategy, stating " 'We should signal that we're confident of those claims.' "

And regarding the "strength" and value of the counterclaims, Kiyomi introduced the testimony of accountant Ebersbacher, who calculated the

27

damages for the parties' counterclaims to be a minimum of $9.8 million.

This evidence shows, as the court found, Adam "conceded there is 'added value' to the case over and above the value of the property to be sold to Boschetti" and "acknowledged seeking a settlement that would be more than just the value of the real property to account for settling the counterclaims."

Kiyomi also presented evidence of conduct subsequent to the execution of the BSA. (See *Southern Cal. Edison, supra*, 37 Cal.App.4th at p. 851 [court may consider the parties' acts subsequent to the execution of the contract and before a controversy has arisen to determine the meaning of contract], citing *Universal Sales, supra*, 20 Cal.2d at p. 761; see 1 Witkin, Summary of Cal. Law (11th ed. 2023) Contracts, § 772 ["The conduct of the parties may be, in effect, a practical construction thereof, for they are probably least likely to be mistaken as to the intent"].)

Specifically, on January 16, 2020, the day after the parties entered into the BSA, Makoff circulated a copy of a proposed amendment to the MSA. That document stated the parties would agree, among other things, that "Any gain or loss on the sale of any property . . . in the performance of the Settlement shall accrue to Adam (and not Kiyomi)" and "there will be no net recovery or liability to divide between them as a result of the terms of Settlement of the Boschetti Litigation." It also states, in Paragraph 5, "This Amendment . . . expressly supersedes Article 15 of the MSA." Adam testified he provided input on the proposed amendment and eventually approved the final draft; Kiyomi did not.

This evidence suggests Adam's acknowledgment that any "gain" or "recovery" from the *Boschetti* litigation settlement would be measured based on the MSA's valuation of the properties ($11.7 million). In other words, it shows Adam's understanding that any amount received under the BSA over

28

and above the $11.7 million valuation of the properties in the MSA would constitute the "recovery" for purposes of Article 15 of the MSA. The evidence further suggests that Adam may have in fact anticipated a recovery under the BSA and that he attempted to obtain Kiyomi's waiver of any claim to that recovery. As Kiyomi posits, why would Adam ask her to waive a right to a recovery under the BSA if he did not believe a recovery existed in the first place?

Adam counters that his December 6, 2019 email to Makoff and Kiyomi was irrelevant because it was not disclosed to Boschetti. He relies on the general rule concerning the objective theory of contracts, which declares that " '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation]" and thus "[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956; see *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 ["The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe"].) We are not persuaded.

Adam's directive to his attorney to take a particular "negotiating posture" in upcoming settlement discussions was an outward, rather than subjective, manifestation of intent. Viewed objectively, the evidence would lead a reasonable person to believe, as the court here observed, that Adam acknowledged seeking a settlement that would be more than just the value of the real property to account for settling the counterclaims. Further, that the email was not disclosed to Boschetti did not preclude its consideration at trial. (See *Heston v. Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 414

[holding plaintiff allowed to introduce defendant's brief filed in previous action, undisclosed to plaintiff, to show defendant's interpretation of a disputed contract term coincided with the plaintiff's interpretation].)

Adam also challenges the court's receipt of evidence of the proposed amendment to the MSA, again on the grounds that the document was not disclosed to Boschetti.[10] However, the rule permitting the admission of conduct subsequent to the execution of a contract, and before any controversy has arisen as to its meaning, "is not limited to the joint conduct of the parties in the course of performance of the contract." (*Southern Cal. Edison, supra,* 37 Cal.App.4th at p. 851.) " 'The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.' " (*Ibid.*, citing 3 Corbin on Contracts (1960) § 558, p. 256; *Heston v. Farmers Ins. Group, supra,* 160 Cal.App.3d at pp. 414–415.)

---

[10] Although Adam argues the trial court erred in admitting this evidence, Adam acknowledges that he himself sought to introduce evidence regarding the drafting of the proposed amendment. Not only that, he claims on appeal that the court erred in excluding his evidence. As mentioned, "a party who himself offers inadmissible evidence is estopped to assert error in regard thereto." (*People v. Williams, supra,* 44 Cal.3d at p. 912.) In any event, we reject the assertion. For one, although Adam claims he should have been permitted to introduce his own evidence on the matter, he offers no legal basis to support this claim. In addition, evidentiary rulings are reviewed for abuse of discretion (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317), and Adam has failed to raise any argument, much less establish, the court here so abused its discretion.

In sum, the language of the BSA, as well as Kiyomi's extrinsic evidence, demonstrates that the BSA is reasonably susceptible to her interpretation. Thus, the parol evidence was admissible to prove what the parties intended. (*Pacific Gas*, *supra*, 69 Cal.2d at pp. 38–40; *Oakland-Alameda County Coliseum Authority v. Golden State Warriors, LLC, supra,* 53 Cal.App.5th at p. 818.)

### The Evidence Supports the Court's Interpretation of the BSA

Having concluded that the BSA is reasonably susceptible to Kiyomi's interpretation, we move to the "second step in the analysis—the ultimate construction to be placed on the ambiguous language." (*Southern Cal. Edison*, *supra*, 37 Cal.App.4th at p. 851.) This step "may call for differing standards of review, depending upon the parol evidence used to construe the contract." (*Winet*, *supra*, 4 Cal.App.4th at pp. 1155–1156.)

The parties disagree on the standard of review that applies to the court's interpretation of the BSA. Adam argues that de novo review applies, because only the inferences to be drawn from the evidence, and not the evidence itself, are in conflict. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 538 ["Because the extrinsic evidence relevant to our analysis is largely uncontradicted, we apply independent review, even when conflicting inferences may be drawn from the evidence"].) Kiyomi agrees that some of the evidence is not in conflict, but contends that other evidence is, and thus those aspects of the evidence raise questions of fact.

In our view, the court's interpretation of the contract addressed a question of fact, because it depended on it deciding between "divergent testimony about what the parties understood [the BSA] to mean" and thus resolving credibility issues. (See *City of Hope*, *supra*, 43 Cal.4th at pp. 394–395; *Winet, supra,* 4 Cal.App.4th at p. 1166.) By way of example, the

statement of decision reflects the court resolved credibility issues raised by evidence concerning the strength of the counterclaims against Boschetti, the extent of Kiyomi's involvement in the settlement discussions in the *Boschetti* actions, and the extent of each party's involvement in preparing the proposed amendment to the MSA. Indeed, the discussion of some of this evidence in the parties' briefs discloses the existence of conflicts in the evidence.

As a result, the substantial evidence standard of review applies to the court's construction of the BSA. (*Winet, supra,* 4 Cal.App.4th at p. 1165.) And we hold there is such evidence to support the court's construction.[11]

We have already described why the text of the BSA is amenable to, and perhaps even more supportive of, Kiyomi's interpretation that the $15.8 million settlement sum includes an amount attributable to the release of the parties' counterclaims against Boschetti. This interpretation, as the court found, is supported by the extrinsic evidence, including the evidence discussed above: Adam's email to attorney Makoff and Kiyomi proposing the concept of "fold[ing] [the] [counter]claims into the property division"; Makoff's agreement to proceed with that negotiating strategy; the high valuation of damages for the counterclaims; and the proposed amendment to the MSA.

Adam nonetheless contends the evidence does not support the court's interpretation. He disputes the court's reliance on his email prior to the settlement conference in the *Boschetti* actions, arguing "the proposition that counterclaim damages were 'folded' into Boschetti's $15.8 million payment directly contradicts the terms of the BSA." We have already rejected the premise of his argument, concluding that the text of the BSA is reasonably susceptible to Kiyomi's interpretation. Thus, the admission of the evidence

---

[11] We would uphold the court's interpretation of the BSA even if de novo review applies.

pertaining to the email did not "add to, detract from, or vary the terms" of the BSA. (*Pacific Gas, supra,* 69 Cal.2d at p. 39.)

With respect to the proposed amendment to the MSA, Kiyomi properly observes that Adam "attempts to distance him[self] from [it], and cites evidence suggesting that he played no role in its formulation." The court, however, found otherwise, suggesting that Adam and Makoff not only proposed the amendment, but did so as part of a "nefarious scheme" in which they "may have actually plotted to structure any resolution with Boschetti so as to avoid any claim that a 'recovery' was obtained."[12] To the extent Adam claims he was not involved in proposing the amendment, he essentially asks us to reweigh the evidence. We decline to do so. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [when reviewing for substantial evidence court does not reweigh the evidence on appeal]; *Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1209 ["If substantial evidence exists, it is of no consequence that the trial court believing other evidence or drawing other reasonable inferences might have reached a contrary conclusion"].) Accordingly, we defer to the court's resolution of credibility determinations and uphold its finding that Adam, along with Makoff, proposed the amendment.

---

[12] In addition to that of the parties, the court heard testimony from Kiyomi's expert witness regarding the custom and practice in the creation and interpretation of settlement agreements. In discussing the BSA, the expert testified, "I think there's enough indication and really the lack of any explanation as to what consideration was paid that benefited directly Kiyomi Sparks for trading her 50 percent of all of the claims in the cross-complaint in exchange for, you know, being part of the whole agreement. [¶] She's the only one that didn't get consideration for what she gave up. And, to me, it doesn't pass the smell test is the best way to say it without sounding offensive. . . . [¶] But there's a big elephant in the corner on this issue, I think . . . ."

Adam also argues the proposed amendment to the MSA "in no way supports the court's conclusion that the BSA includes payment for something other than real estate gain or loss." Adam does not meaningfully explain this assertion, and, in any event, we disagree with it. As explained above, based on the language of the proposed amendment, as well as Adam's contribution to and approval of it, the court could reasonably infer that Adam understood the MSA values for the properties would serve as the yardstick by which to measure any "recovery" realized under the BSA. The court could further infer from this evidence that Adam anticipated that the BSA would in fact provide for such a recovery and, with this understanding, attempted to get Kiyomi to waive her ability to claim that recovery. There would be no need for Adam to obtain Kiyomi's waiver of her claim to a recovery under the BSA if he did not believe a recovery was forthcoming. Thus, Adam's conduct subsequent to the execution of the BSA supports the court's finding in favor of Kiyomi's interpretation. (See *Universal Sales*, *supra*, 20 Cal.2d at p. 761 ["a construction given to [a contract] by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight"]; see *Crestview Cemetery Ass'n. v. Dieden* (1960) 54 Cal.2d 744, 754 ["This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words' . . ."].)

We thus conclude that the circumstances surrounding the making of the BSA and the parties' conduct subsequent to the execution of the BSA supplies substantial evidence supporting the court's interpretation of the BSA. And we do not reweigh the evidence or parse other testimony or exhibits to see if the trial court might have reached a contrary conclusion. (*Hasson v. Ford Motor Co.*, *supra*, 32 Cal.3d at p. 398; *Picerne Construction*

34

*Corp. v. Castellino Villas*, *supra*, 244 Cal.App.4th at p. 1209.)  But we briefly highlight why the extrinsic evidence supporting Adam's interpretation of the BSA is comparatively weaker.

Adam points to portions of his testimony to argue that, contrary to the court's finding, there was no "increase" in value of the properties between the time of the MSA and the time of the BSA, and therefore he did not receive an amount "over and above" the MSA's valuations of the properties to be sold to Boschetti.  When asked why there was a difference between the purchase price ($15.8 million) and the values of the properties assigned in the MSA ($11.7 million), Adam testified that the $11.7 million valuation in the MSA reflected the net value of the properties, discounted by 20 percent due to them being under "fractional" ownership at the time.  By virtue of the sale of the properties to Boschetti pursuant to the BSA, Adam testified, Boschetti would become the sole owner of the properties, the properties thus would no longer be "fractionally" owned, and consequently the 20-percent discount due to fractional ownership would no longer be applicable.  Without that discount, Adam asserted, the value of the properties was $16.7 million.  Adam further testified that he and Boschetti negotiated a discount of a $1 million, because Boschetti agreed to purchase the subject properties at all once.  The $15.8 million purchase price thus equaled the $16.7 million, less the $1 million discount.  Adam's theory, then, was that there was no "variance between the Boschetti settlement amount and the MSA values . . . and there simply [was] no 'recovery' above the real estate value."

Despite his testimony that the $15.8 million settlement sum was based on the market value of the subject properties, Adam confirmed that no independent appraisal of the properties had been performed.  Given the absence of an appraisal or other objective source to justify the difference

between the $11.7 million figure under the MSA and the $15.8 million sum under the BSA, the court was not required to accept Adam's self-serving testimony as to what he claimed the properties were actually worth. (See *Guerra v. Balestrieri* (1954) 127 Cal.App.2d 511, 515 ["[T]he trier of the facts is not required to believe everything that a witness says even if uncontradicted"], citing *Blank v. Coffin* (1942) 20 Cal.2d 457, 461 [trier of fact "is free to disbelieve [witnesses] though they are uncontradicted if there is any rational ground for doing so"].) Thus, the court was entitled to find "there was no evidence presented to support an 'independent' basis for the properties to have increased in value by $4.1 million in the eight months since execution of the MSA."

This finding receives additional support from what appears to be internally inconsistent testimony from Adam regarding the origin of the $15.8 million settlement amount. At times Adam testified that he initially proposed the $16.7 million price based on what he claimed was the market value of the properties. Other times, however, he testified that Boschetti offered to pay $15.8 million, and that his (Adam's) attorney then assigned values to each property to be sold, such that those values would "match up" to the $15.8 million offered by Boschetti. The latter testimony seems to suggest that the $15.8 million was arrived at somewhat arbitrarily—that it was Boschetti who came forward with the $15.8 million price, and that Adam worked backwards from that amount and assigned values to each property so that those values would sum up to the $15.8 million offer. In light of this ambiguity, if not inconsistency, in Adam's testimony regarding how the $15.8 million figure originated, the court was not required to believe his explanation.

In short, the record supports the court's conclusion "that the amount

36

received from Boschetti in the settlement over and above the $11.7 million worth of property as valued approximately eight months earlier is a 'recovery' of a community asset in the amount of $4.1 million for the purposes of Article 15 and is to be equally shared between Adam and Kiyomi.

In addition to the extrinsic evidence, other general principles of contract support the court's determination. Of particular importance in this case is the rule that " 'If a contract is capable of two constructions courts are bound to give such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect.' " (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953–954; accord, *Cohn v. Cohn* (1942) 20 Cal.2d 65, 70; Civ. Code, § 1643; see also *West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (2023) 90 Cal.App.5th 1179, 1185 ["the court 'should avoid an interpretation which will make the contract unusual, extraordinary, harsh, unjust or inequitable . . . , or which would result in an absurdity' "].)

Applying these principles, we conclude Kiyomi's interpretation of the BSA is the more reasonable one. The facts of this case demonstrate the inequity that would result from adopting the interpretation put forth by Adam. For example, as discussed, the court found there was evidence to suggest Adam and Makoff may have engaged in a "nefarious scheme" in which they had "plotted to structure any resolution with Boschetti so as to avoid any claim that a 'recovery' was obtained." When viewed against this finding, adopting Adam's interpretation of the BSA would have rendered the BSA unfair, unlawful, and/or unreasonable. The court properly declined to adopt an interpretation that would produce such a result.

In addition, the court observed that "[t]he only rational implication to be derived from" Article 15 of the MSA is that "the parties would equally

share any of the burdens as well as any of the benefits from the Boschetti Litigation, whatever the source." It is undisputed that Kiyomi and Adam equally shared in the "burdens" imposed by the *Boschetti* actions—they jointly defended Boschetti's claims and paid Makoff's legal fees and costs in the actions. Indeed, the court in this case granted Adam's RFO to compel Kiyomi to pay her half of the outstanding fees owed to attorney Makoff. Yet, Adam maintains that Kiyomi was not entitled to any benefits received from the *Boschetti* actions. As Kiyomi asserts, "Adam should not be allowed at the same time to enforce Article 15's burdens against Kiyomi by seeking fees, and deny Article 15's benefits to Kiyomi by keeping the Boschetti settlement proceeds for himself." Despite Adam's description of the counterclaims as "his" counterclaims throughout his briefs, he does not contest the court's finding that the counterclaims belonged to the community. (See *Vick v. DaCorsi* (2003) 110 Cal.App.4th 206, 212, fn. 35 [a cause of action to recovery money damages is a form of personal property, and personal property acquired during the marriage is community property].) As such, Kiyomi had just as much of an interest in those claims as Adam did. It follows that Kiyomi had just as much of a right to recover for relinquishing such claims as Adam did. It would be inequitable for the court to have required Kiyomi to share in the costs of obtaining a recovery, but not in that actual recovery.

Finally, if application of the canons of contract construction were not enough, the court's conclusion is supported by this additional principle: "Family law cases 'are equitable proceedings in which the court must have the ability to exercise discretion to achieve fairness and equity.' " (*In re Marriage of Egedi* (2001) 88 Cal.App.4th 17, 22–23.) For the reasons stated above, the court properly fashioned an award that ensured equity between the parties.

**The Court Properly Awarded Kiyomi Attorney Fees**

Because we affirm the trial court's decision to grant Kiyomi's RFO to enforce Article 15 of the MSA, we also affirm its finding that Kiyomi was the prevailing party on her RFO and therefore entitled to attorney fees under Articles 37 and 39 of the MSA.

## DISPOSITION

The judgment entered on September 16, 2021 is affirmed. Kiyomi shall recover her costs on appeal.

_____

Richman, J.

We concur:

_____

Stewart, P.J.

_____

Markman, J. *

*In re Marriage of Sparks* (A163637)

*Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.